# Richmond

## L. FELDMAN, ETC. v. A. D. RUCKER, TRUSTEE, ET AL.

June 22, 1959.

Record No. 4965.

Present, Eggleston, C. J., and Buchanan, Miller, Whittle, Snead and I'Anson, JJ.

12

The opinion states the case.

*Harold H. Dervishian* and *Marshall L. Lowenstein* (*Dervishian & Dervishian*, on brief), for the appellant.

*Joe T. Mizell, Jr.* (*Robert B. Gayle; Mizell, Gayle & Binns*, on brief), for the appellees.

MILLER, J., delivered the opinion of the court.

In this suit A. D. Rucker and C. E. Richardson, trustees under a deed of trust on a parcel of real property to secure a debt, asked the court to require Leon Feldman, purchaser of the property at an auction foreclosure sale, to specifically perform his contract. From a decree requiring specific performance, Feldman appealed.

The testimony introduced by the trustees was in deposition form but that offered by Feldman was held *ore tenus* by the chancellor. Summarized, the pertinent evidence and incidents of trial follow:

The auction sale was advertised in compliance with the terms of the deed of trust. On June 17, 1956, Feldman saw the advertisement of sale in the newspaper, and the next morning he called the office of the trustees for confirmation that the sale would be held that afternoon at 4:30 as advertised. The sale was held at the appointed hour on June 18th, and a photostatic copy of the advertisement, showing the purchase price to be $3,250, signed by Feldman when the property was knocked out to him as the highest bidder, was introduced in evidence.

At the time of the sale the two-story brick dwelling on the lot was dilapidated and had been unoccupied for months. Its condition was such as to make it obvious that it was untenantable and had been for a considerable time.

Feldman went to the premises shortly before the hour of sale and inspected the property which was then open for that purpose. He observed that the house had a new front porch, entered the building and walked around and inspected the front and back rooms on both floors. He then went outside, looked at the front wall, walked around the north side of the house and then to the back and looked at both the north and rear or east wall.

He admits that he observed that the floors in the rear rooms were slanting at an angle because of the settling of the walls; windows had been broken out; plaster was badly cracked, painting was needed, and plumbing had to be replaced. In short, he observed that material and extensive repairs were needed to make the dwelling habitable. In addition to these defects and need of repairs that Feldman observed, there were other obvious defects which he, however, denies having seen. The rear wall and a portion of one side wall of the building were leaning. In the southern side wall a V-shaped, open crack was observable upon inspection, and an effort to remedy the condition by shoring around the wall foundation was evident. On this side wall there was an iron plate apparently used in connection with a tie-bar. A walkway three feet wide lies between the south wall and the building on the south. However, a locked gate upon the walkway, which is located on the adjoining property, obstructed passage along the south wall, and Feldman says that he could not observe that wall sufficiently to ascertain the presence or absence of defects in it.

At the auction sale the auctioneer read the notice and asked if there were any questions, and there being none, the bidding began. A representative of the noteholder bid at the sale, but the principal bidders were Feldman and a man named Vaughan. The bids of these two continued until Feldman bid $3,250, which was the highest sum offered, and the property was knocked out to him.

Upon examination of the title it was found clear and marketable. Friday, June 22, was agreed upon for settlement, and the deed of conveyance was prepared for delivery. However, on that morning Feldman learned at the bank where he had a deposit account that he would lose $90 in interest if he then withdraw his money. He conveyed this information to the trustees and offered to make deposit of $250 and asked for a week's delay in concluding his purchase. His request was granted, $250 paid to C. E. Richardson, Jr., trustee, and it was agreed that the settlement should be made a week later.

On June 22, Feldman also asked for and obtained the keys to the house to have it cleaned preparatory to repairing, painting and replacement of plumbing fixtures. He arranged with two people to meet him the next day to help remove the trash, and on June 23, 1956, he drove to the house and after parking his automobile, walked by Sporn's nearby grocery store. Upon seeing him, Mr. Sporn asked Feldman if he had purchased the property, 711 North Fourth street. During their conversation Feldman received information that prompted him to call Mr. Hollis at the city Bureau of Building Inspection. After talking with Mr. Hollis on the morning of June 25, 1956, the two met at the property that day about 11 a.m.

It was then that Feldman learned that the building inspector had found the premises unsafe for use as a dwelling months earlier and had required the owner, Purley Adams, and his family to move out. The premises were vacated in December, 1955, and remained untenanted. On May 16, 1956, the building inspector wrote a letter to the owner and advised that inspection of the dwelling disclosed that "approximately 20 feet of the rear portion has settled to the extent that it has become dangerous" and directed the owner "to start work at once to correct the condition." The property was not then condemned nor placarded for condemnation. It was subject to repair and rehabilitation. Condemnation proceedings were not begun until November 21, 1956, and in the notice to Purley Adams of that date it is stated that repair work could be undertaken at any time not later than December 21, 1956.

When Feldman and Hollis met at the premises, they walked around the house as Feldman had done on the day of the auction. Hollis leaned over the fence and tried to point out to Feldman a crack in the south wall, which it appeared Feldman was unable to see. The occupant of the adjoining property was then asked for permission to go into her yard, and when the gate was unlocked, Feldman went into the adjoining yard where Hollis pointed out to him the V-shaped crack running downward from the top of the wall three feet and located about twenty feet from the rear of the house. He also pointed out to Feldman the end of an iron rod near the top of the wall which was fastened through the wall to the roof, and called his attention to the concrete that had been poured at the bottom of the wall to prevent it from sinking. Hollis informed Feldman that the rear twenty feet of the wall would have to be rebuilt with a new foundation. Feldman then went to the trustees' office and told

Richardson what he had learned, gave him back the keys and demanded return of the $250 deposit. Refund of the money was refused, and Feldman thereupon said that the only way he would consider taking the property would be if Richardson rebuilt it. Though a good and sufficient deed was executed and tendered to him, he refused to complete his purchase and adhered to that position without obtaining an estimate from any contractor or making inquiry as to the cost of rehabilitating the building.

The testimony further discloses that there was a second deed of trust on this property, and Purley Adams had sometime prior to the foreclosure sale attempted to obtain a $2,600 loan to repair the building, but he was unsuccessful in obtaining the loan.

On August 22, 1956, Feldman instituted a suit against the trustees and others to rescind his contract of purchase. He alleged that the building had been condemned, that notice to that effect had been affixed to the building but removed before the foreclosure sale, that the trustees were aware of the condemnation of which he was ignorant, and it was the trustees' duty to disclose the existence of latent defects in the building.

In their answer the trustees denied the material allegations of the bill and concluded by saying that they believed "that the sale should be confirmed," Feldman's petition for rescission dismissed, and "he be ordered and required to take the property in accordance with" his bid.

This answer was not treated by the litigants or the court as a cross-bill. It was captioned and designated as an answer when filed by order of court, and it was neither served upon Feldman nor answered by him. Rules of Court 2:13 and 2:17.

The testimony was heard *ore tenus* on October 23, 1957, and at the conclusion of Feldman's evidence, the chancellor sustained the trustees' motion to strike. By decree of that day the relief prayed for was denied and the bill dismissed.

In the present suit for specific performance copies of the bill of complaint, answers and decree in the rescission suit were presented in evidence in support of a plea of res adjudicata filed by Feldman to the trustees' bill.

It is claimed by Feldman that the pleadings were such as to empower the court to require him to specifically perform the contract and thus the final decree, which only refused rescission of the con-

tract as asked by him, is res adjudicata of the trustees' right to specific performance.

After consideration of all evidence, that offered in support of the plea, as well as that having to do with the condition of the premises, the court overruled the plea and decided that the trustees were entitled to have their contract of sale enforced. In its decree of June 23, 1958, payment of the $250 deposit was recited, and it was then adjudged and decreed that Feldman pay to "A. D. Rucker and C. E. Richardson, trustees, the sum of $3,000, with interest thereon from the 18th day of June, 1956, until paid, and the costs of this suit." It was also decreed that upon payment of the $3,000, interest and costs, the trustees deliver to Feldman their deed dated June 18, 1956, and it is then recited that the trustees asked leave to file the deed "in the papers of this cause, duly executed and acknowledged," bearing the appropriate amount of revenue stamps to be delivered to Feldman by the clerk upon his compliance with the judgment and decree of the court, and the deed was so filed in the papers by the trustees.

Subsequent to entry of the decree of June 23, 1958, Feldman retained his present counsel, and on August 8, 1958, they lodged with the clerk of the chancery court a petition for rehearing and served upon counsel for the trustees written notice that on August 18, 1958, they would ask the court to grant a rehearing in the cause and set aside the decree of June 23, 1958. In this petition for rehearing the decree of June 23, 1958, is termed an *interlocutory* decree, and it is asserted to be apparent on the fact of the record that the "sale is void and otherwise insufficient to sustain a decree of specific performance." The specific grounds of attack were that (a) the deed of trust did not empower one trustee to act without the other, and the evidence conclusively proved that A. D. Rucker, trustee, was not present at the foreclosure sale, and (b) trustees, and beneficiaries and creditors under other liens, their heirs and assigns, were not parties to the suit.

In a supplementary certificate of the incidents of the case signed by the trial judge on August 19, 1958, pursuant to Rule of Court 5:1, it appears that after giving notice to counsel for defendants on August 8, 1958, Feldman lodged his petition to rehear with the clerk on that day, and on August 18, 1958, leave of court to file the petition was requested. In the certificate it is pointed out that the bill of complaint alleged that "the plaintiffs, A. D. Rucker & C. E.

Richardson, Jr., trustees, * * * offered for sale at public auction on the premises * * *" the real property which is now the subject matter of litigation and that this allegation was not traversed in the original answer. It is also stated that neither of the alleged irregularities, *i.e.*, absence of one trustee at the sale and lack of parties, now relied upon in the petition, was brought to the attention of the court during the trial. For these reasons leave to file the petition to rehear was denied.

The bill sufficiently alleged that A. D. Rucker attended the sale, and it does not conclusively appear from the record that he did not attend, though from the testimony of one witness, that finding could be reasonably made. Nor does the absence of *necessary* parties to the cause appear from the record. This being true, the rehearing was properly denied. The rehearing was also rightly denied because the decree sought to be set aside was not a mere interlocutory decree that only decided the principles of the cause. It awarded judgment against Feldman for $3,000 with interest and costs, and directed the trustees to deposit the deed with the clerk for delivery to Feldman upon the payment of the judgment and costs, and the deed was so deposited. The decree thus adjudicated, settled, and disposed of all issues of law and fact between the trustees and Feldman. All the relief sought was awarded, and the decree left nothing to be done in the cause except its ministerial execution. It is not an interlocutory decree, but a final decree. *Richardson* v. *Gardner*, 128 Va. 676, 105 S. E. 225; *Marchant & Taylor* v. *Mathews County, et al.*, 139 Va. 723, 124 S. E. 420; 11 M. J., Judgments and Decrees, § 7, p. 33, and cases cited.

More than twenty-one days having elapsed after entry of this final decree before the rehearing was sought because of alleged irregularities in the sale and lack of interested parties, the court lacked the power to modify or vacate the decree. Rule of Court 2:22.

We find no merit in the contention that the final decree in the suit brought by Feldman for rescission is res adjudicata of the trustees' right to specific performance. Examination of the pleadings and final decree, which were put in evidence in this case, discloses that specific performance of the sale was not sought by the trustees in the rescission suit nor was their right to specific performance there put in issue. The trustees' answer expressed the belief that the sale should be confirmed and Feldman ordered to take the property, but the answer was not served on Feldman or treated as a cross-bill

under Rules of Court 2:13 and 2:17, nor considered as a cross-bill by the litigants or the court. In the chancellor's opinion in the present case it is expressly stated that the trustees' answer in the rescission suit was not a cross-bill, and it was not treated as a cross-bill. Neither by the pleadings nor during the *ore tenus* trial was any affirmative relief sought by the trustees. They offered no testimony, and the court struck Feldman's evidence and dismissed his bill without any litigant or the court undertaking to say or determine whether or not the trustees were entitled to specific performance.

In the suit for rescission the dominant issue was whether or not fraud had been perpetrated upon the purchaser which entitled him to have his contract cancelled. That issue was squarely presented by the pleadings and was the only issue litigated. The issue presented in this suit is materially different. It is whether or not the trustees are entitled to specific performance. The first cause of action instituted by Feldman was an assertion of his alleged right to rescission of the contract. The trustees successfully met that issue. The second cause of action brought by the trustees was an assertion of their alleged right to have specific performance of the contract. It presented another cause of action and a different issue, and its determination was dependent upon different proof and principles of law.

"One who asserts the defense of res adjudicata has the burden of proving that the very point or question was in issue and determined in the former suit. 50 C. J. S., Judgments, § 843, pp. 410, 411; 30 Am. Jur., Judgments, § 272, p. 992. Proof of identity of issues must be established by a preponderance of the evidence. 50 C. J. S., Judgments, § 843-c. p. 417; *Fishburne v. Ferguson*, 85 Va. 321, 325, 7 S. E. 361. \* \* \*" *Worrie v. Boze*, 198 Va. 533, 95 S. E. 2d 192. 8 M. J., §§ 52 and 53, pp. 627, 630, and cases cited.

Clearly Feldman's cause of action for rescission of the contract was different from the trustees' cause of action for specific performance of the contract. Hence the plea of res adjudicata was rightly overruled.

This brings us to Feldman's contentions that he should not be required to specifically perform his contract on the following grounds, which, as stated in his answer are: (1) the trustees' failure to disclose that the building "was in the process of being condemned" and would have to be rebuilt "from a new foundation at an expense" in excess of the sale price; (2) the subsequent condemnation and demolition of the building by municipal action because of "the

dangerous and defective condition of the wall, a situation which was known to the seller but unknown to the buyer at the time of the sale;" (3) that enforcement of the contract "would be inequitable and would work a hardship * * *;" (4) that "elements of fraud, misrepresentation and mistake" are involved; and (5) that performance is impossible because of "lack of subject matter."

It is sufficient to say that contentions numbered 1 and 4 are unsupported by the evidence, and as to number 3 there was no obligation on the trustees to advise the bidders as to the condition of the building which was obvious on inspection. The testimony and the written communication from the office of the building inspector to Purley Adams of May 16, 1956, discloses that the building was not in process of being condemned before the sale. It was then subject to repair and rehabilitation. Nor does it appear from the evidence that the costs of repair would have exceeded the sale price of the property. What the value of the property would have been had it been promptly repaired by Feldman after his purchase as it could have been, is not stated. However, it is certain that it was subject to repair, for the communication from the building inspector to the owner on May 16, 1956, directed him to "start work at once to correct the condition." Likewise, the statement made by Hollis to Feldman on June 25, 1956, advised him that the rear part of one wall would have to be rebuilt, and the communication from the Department of Public Safety to Purley Adams and his wife of November 21, 1956, stated that it "would be necessary to repair or demolish this condemned building" if repair work to correct its dangerous condition was not started by December 21, 1956. The evidence is insufficient to establish any fraud, misrepresentation or mistake for nothing was done by the trustees to prevent the purchaser or any other bidder from inspecting and examining the building and premises to their satisfaction. In fact, the building was open for inspection before the hour of sale and inspected by Feldman both inside and out. The final decree in the suit brought by Feldman for rescission of the contract on the ground of fraud, misrepresentation and mistake, and introduced by him in evidence in this case, is convincing proof of the lack of those elements.

The parties were dealing at arm's length, and gratuitous disclosures by the trustees that they are not called on to make may chill the bidding to the detriment of the noteholder or the owner of the equity of redemption. The mere failure of the trustees to advise

prospective bidders of the condition of the building, which in this instance was open and obvious, falls well short of fraud and misrepresentation. In foreclosure sales of this character by trustees, the rule of *caveat emptor* applies.

"In such transaction there is no element of guaranty or warranty, either of title or quantity of the land. * * * To such a sale the principle of *caveat emptor* applies." *Motley* v. *Hodges,* 120 Va. 498, 499, 91 S. E. 757. *Smith* v. *Woodward,* 122 Va. 356, 94 S. E. 916; *Wills* v. *Chesapeake Western Ry.,* 178 Va. 314, 16 S. E. 2d 649; *Powell* v. *Adams,* 179 Va. 170, 18 S. E. 2d 261.

The reasons for the application of the rule of *caveat emptor* to these sales is well stated in the trial judge's opinion:

"Such a trustee is an agent acting under a power of sale. He has no powers except those conferred upon him by the deed of trust. He is agent for both parties, the owner and the lienor, under duties to them. Among those duties is that of bringing 'the property to the hammer under every possible advantage to his *cestui que trusts,*' using all reasonable diligence to obtain the best price. To the bidders he owes no duty except to refrain actively from doing anything to hamper them in their search for information or to prevent the discovery of defects by inspection. He is under no duty to make representations or to answer questions; but if questions are asked and he undertakes to answer, then such answers must be full and accurate—nothing must then be concealed. If authority be sought for these plain principles of settled law it is found in the cases already cited, in *Preston* v. *Johnson,* 105 Va. 238, in *Linney* v. *Normoyle,* 145 Va. 589, and in other Virginia cases too numerous to require citation."

In 37 Am. Jur., Mortgages, § 821, p. 209, the duty of the trustees acting under this character of instrument and similar circumstances is stated thus:

"* * * At a sale by a trustee under a power, where the facts or means of information concerning the condition and value of the property sold are equally accessible to both parties, and nothing is said or done which tends to impose on the other, or to mislead him, there is no fraud of which the law can take notice, * * *."

The claim of inequity and hardship asserted by Feldman is so closely related to his defense of impossibility of performance because of the demolition of the building by municipal authorities that they will be dealt with together. It must be kept in mind that the dwelling was not demolished until December, 1956, and thus

for six months after the sale Feldman could have undertaken repair of the building though the trustees had no such right or power.

"\* \* \* The contract of sale was consummated when the auctioneer cried the property out to the person making the highest and last bid. The only power remaining in the trustees, so far as the purchaser was concerned, was to collect the purchase money and execute a proper deed conveying such property and title as had been conveyed to them." *Powell* v. *Adams, supra*, at 174.

Nor did the noteholder have authority to make repairs, for he was a mere lienor who owned no estate in the property. *Gravatt* v. *Lane*, 121 Va. 44, 92 S. E. 912.

It is plain that the loss occasioned by demolition of the building, which could have been avoided by Feldman but could not have been prevented by the trustees or noteholder, affords no just cause for denying specific performance of the contract. Here it is apparent that through failure to repair which ultimately resulted in demolition of the building, a hardship must be inevitably suffered by an interested party. Neither the noteholder nor the trustees engaged in any inequitable conduct or practice, nor did they have the power to avoid the loss. Yet Feldman did enjoy the power and right to repair the building during a long period of time and thus prevent its destruction. His lack of grounds to have rescission of his contract of purchase and the legal validity of that contract were judicially established and declared in the suit instituted by him while the building was subject to repair.

Thus the inequitable conduct of the purchaser in refusing to protect and preserve the subject matter involved when the other interested persons were unable to do so, contributed to and resulted in the loss and hardship of which he now complains. This circumstance constitutes a material feature in the facts of this case, distinguishing it from *Clay* v. *Landreth*, 187 Va. 169, 45 S. E. 2d 875, upon which Feldman relies. In that case the court said:

"It was averred that between the time the contract was made and the time for the delivery of the deed the city council rezoned this lot so that it could be used only for residence purposes; \* \* \*." At page 171.

And there in conclusion on page 180 the court expressly declared in the following words that no inequitable conduct had been indulged in by either litigant.

"The agreed facts contain nothing that would show any in-

equitable conduct on the part of either the complainant or the defendant."

It follows that under the facts here in evidence the hardship that resulted from destruction of the building and the inability of the trustees to convey the property to Feldman in the same condition that it was when sold afford no ground upon which to refuse specific performance of the contract.

*Affirmed.*