564 So.2d 1 (1989)
Richard C. HILL, Superintendent of Education; Fred Bagley, President of Forest Municipal Separate School District Board; and Burt Atkinson, Eddie Lee Johnson, Roland Harris, and Mrs. George Taylor, Jr., Members of the Forest Municipal Separate School District Board
v.
William C. THOMPSON.
No. 07-58509.
Supreme Court of Mississippi.
October 11, 1989.
Rehearing Denied August 8, 1990.
*2 Mack Cameron, Jackson, for appellant.
Evan L. Thompson, Forest, for appellee.
Edwin Lloyd Pittman, Atty. Gen., Mike C. Moore, Atty. Gen., Helen Wetherbee, Sp. Asst. Atty. Gen., James O. Nelson, II, Kenneth A. Rutherford, Irene C. Howard, Thomas Price Firm, Jackson, for amicus curiae.
En Banc.
PRATHER, Justice, for the Court:
This appeal challenges a Sixteenth Section School Lands Trust lease under the Mississippi Constitution which prohibits the donation of state lands to private individuals. The case concerns a commercial property in downtown Forest, Mississippi, that for years and until recently was used as a gasoline and motor vehicle service station. The lot was leased for a one-time payment of $7.50 for a ninety-nine year term and the assertion is made that this consideration is so grossly inadequate that it violates the donation clause of Article 4, Section 95, Mississippi Constitution. Additionally, issues relating to the applicability of 1978 Reform Act retrospectively, statutory requirements of appraisals of trust lands, and trial procedures are also presented for resolution.
The case began by William C. Thompson (Thompson) filing a complaint in the Chancery Court of Scott County for confirmation of his title to a leasehold interest of Sixteenth Section School Trust land. The suit named as defendants the State of Mississippi, a body politic, whose agent for process in this cause was: the Superintendent and the members of the Board of Trustees of the Forest Municipal Separate School District, the president and members of the Board of Supervisors of Scott County, and the Scott County Board of Education, all in their official capacities.[1] The Chancery Court confirmed title of the lease in the complainant Thompson and imposed *3 a sanction for recovery of attorney's fees in Thompson's favor against the Forest Municipal Separate School District for Seven Thousand Five Hundred Dollars ($7,500.00) and court costs. From this judgment, the School Board and Richard C. Hill, its Superintendent, appeal and present twelve assignments of error, not all of which need to be addressed, for reasons that will presently appear.
On this appeal, briefs were filed by Edwin Lloyd Pittman, then-Attorney General, on behalf of Dick Molpus, Secretary of State, and by Mississippi Valley Title Insurance Company, as Amici Curiae.

I.
The real estate involved in this lawsuit is described as Lot 6, Block 7 of Section 16, Township 6 North, Range 8 East, Scott County, Mississippi (hereinafter referred to as Lot 6). It measures forty (40) feet north and south and eighty-five (85) feet east and west and lies within the city limits of Forest, Mississippi and within the Forest Municipal Separate School District. By use and zoning, the lot has long been classified commercial.
The record of this case shows a partial history of the lot at issue. On May 9, 1859, the Board of Police of Scott County, Mississippi leased the northeast quarter and east half of the northwest quarter of Section 16, Township 6, Range 8, Scott County, consisting of 240 acres, at a consideration of $88.00 for a period of 99 years. Per acre, per year, the consideration was about $0.0037037. Lot 6 is a part of that 1859 lease. The various subsequent lease transfers before 1943 are unimportant to the deposition of this case.
In January, 1943, in the case of Davenport Et al. v. All Persons, Etc., Cause No. 5,076, the Chancery Court of Scott County confirmed the unexpired 1859 leasehold interest in Lot 6 in Standard Oil Company against all persons claiming any legal or equitable title.
On March 21, 1955, with a little over four years remaining on the original 99 year lease, Standard Oil conveyed its interest in Lot 6 to H.L. Lackey, reserving all service station equipment to itself with removal rights to the same. Shortly thereafter on May 2, 1955, Lackey obtained a new Sixteenth Section Lease to the property from the Scott County Board of Supervisors, acting under the purported authority of 1948 Mississippi Laws, Chapter 497, again for 99 years. The consideration for this new lease was a one time payment of $7.50. On July 5, 1960, the transaction was repeated as another 99 year lease was issued to Lackey, again for a gross sum rental of $7.50, under the authority of the 1956 Mississippi Laws, Chapter 290. After H.L. Lackey's death his heirs conveyed his leasehold interest to Kenneth Haden, et ux., the purchase price of which was secured by a deed of trust in favor of Lackey's heirs. Apparently Haden defaulted, as the deed of trust was foreclosed by the trustee on January 25, 1985, and the leasehold interest was purchased by William C. Thompson, the plaintiff, for a consideration of $7,000.00. The Trustee's deed conveyed "Lot 6" and did not mention the leasehold interest nor the reservation of the service station equipment, except by reference to the Deed of Trust which is not a part of the record.

II.
Procedurally, this case comes to this Court in the following manner. On March 17, 1986, William C. Thompson filed his complaint for confirmation of his sixteenth section school trust lease for a 99 year period to run from July 5, 1960, the date of the last lease to H.L. Lackey.
The defendant School Board filed its answer denying that Thompson had good title. The basis for its position was that, because both the 1955 and 1960 leases were issued for a one-time payment of $7.50 for a ninety-nine (99) year period, the consideration was so grossly inadequate as to constitute a donation of public land in violation of the Mississippi Constitution and applicable statutes. The Board's counterclaim sought voiding of both 1955 and 1960 leases and confirmation of title, free of any lease, in the State of Mississippi in trust for the public schools.
*4 On May 8, 1987 the Chancery Court entered final judgment which confirmed title in William C. Thompson to an unexpired ninety-nine (99) year Sixteenth Section Leasehold title in Lot 6 to terminate at midnight July 4, 2059. Further, the Chancery Court assessed sanctions in the form of attorney's fees against the Forest Municipal Separate School District, its Superintendent, Board of Trustees and their successors in office in the sum of seven thousand five hundred dollars ($7,500.00) with legal interest, on grounds that the School Board had filed a frivolous defense and counterclaim. Rule 11(b), M.R.C.P. The counterclaim of the defendant Board, which sought to confirm leasehold title in the State of Mississippi in trust for the public schools, was dismissed with prejudice.

III.
As this is another case involving Sixteenth Section School Trust lands, a reiteration of the historical facts will be helpful before analyzing their legal significance. Such a concise history can be found in the recent case of Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), which arises from a Mississippi controversy.
The history of public school lands in the United States stretches back over 200 years. Even before the ratification of the Constitution, the Congress of the Confederation initiated a practice with regard to the Northwest Territory which was followed with most other public lands that eventually became States and were admitted to the Union. In particular, the Land Ordinance of 1785, which provided for the survey and sale of the Northwest Territory, "reserved the lot No. 16, of every township, for the maintenance of public schools within the said township... ." 1 Laws of the United States 565 (1815). In 1802, when the eastern portion of the Northwest Territory became what is now the State of Ohio, Congress granted Ohio the lands that had been previously reserved under the 1785 Ordinance for the use of public schools in the State. 2 Stat 175.
Following the Ohio example of reserving lands for the maintenance of public schools, "`grants were made for common school purposes to each of the public land States admitted to the Union. Between the years of 1802 and 1846 the grants were of every section sixteen, and, thereafter, of sections sixteen and thirty-six. In some instances, additional sections have been granted.'" Andrus v. Utah, 446 U.S. 500, 506-507, n 7, 64 L.Ed.2d 458, 100 S.Ct. 1803 [1806-07] (1980) (quoting United States v. Morrison, 240 U.S. 192, 198, 60 L.Ed. 599, 36 S.Ct. 326 [328] (1916) (footnotes omitted)). Thus, the basic Ohio example has been followed with respect to all but a few of the States admitted since then. 446 U.S. at 522-523, n 4, 64 L.Ed.2d 458, 100 S.Ct. 1803 [1814-15] (Powell, J., dissenting). In addition to the school lands designated in this manner, Congress made provision for townships in which the pertinent section or sections were not available for one reason or another. Thus, Congress generally indemnified States for the missing designated sections, allowing the States to select lands in an amount equal to and in lieu of the designated but unavailable lands. See, e.g., Ch. 83, 4 Stat. 179 (1826). See generally Andrus v. Utah, supra, at 507-508, 64 L.Ed.2d 458, 100 S.Ct. 1803 [1807]; Morrison, supra, [240 U.S.] at 200-202, 60 L.Ed. 599, 36 S.Ct. 326 [329].
Although the basic pattern of school lands grants was generally consistent from State to State in terms of the reservation and grant of the lands, the specific provisions of the grants varied by State and over time. See generally B. Hibbard, A History of the Public Land Policies 314-318 (1939). For example, in Indiana and Alabama, the school lands were expressly granted to the inhabitants of the townships directly. See 3 Stat. 290 (1816) (Indiana); 3 Stat. 491 (1819) (Alabama). In most of the other grants before 1845, the school lands were given instead to the States but were explicitly designated to be for the use of the townships in which they lay. *5 See, e.g., 2 Stat. 233-234 (1803) (Mississippi); 3 Stat. 375 (1817) (same); 5 Stat. 58 (1836) (Arkansas). The Michigan grant in 1836, on the other hand, was simply "to the State for the use of schools." See 5 Stat. 59. After 1845, the type of grant used in Michigan, granting the lands to the State for the use of its schools generally became the norm. See, e.g., 9 Stat. 58 (1846) (Wisconsin); 11 Stat. 383 (1859) (Oregon). Finally, the most recent grants are phrased not as outright gifts to the States for a specific use but instead as express trusts. These grants also are stated to the States for the support of the schools in those States generally. In addition, though, under these grants the State is specifically designated a trustee, there are explicit restrictions on the management and disposition of the lands in trust, and the Federal Government expressly retains an ongoing oversight responsibility. See, e.g., 36 Stat. 574 (1910) (Arizona and New Mexico).
The history of the school lands grants in Mississippi generally follows the pattern thus described. In 1798, Congress created the Mississippi Territory, which included what is now about the southern third of the States of Mississippi and Alabama. 1 Stat. 549. In 1803, Congress provided for the sale and survey of all Mississippi Territory lands to which Indian title had been extinguished but excepted "the section number sixteen, which shall be reserved in each township for the support of schools within the same." Stat. 233-234. In 1804, the Mississippi Territory was extended northward to the southern boundary of Tennessee. 2 Stat. 305. Two years later Congress authorized the selection of lands in lieu of unavailable Sixteenth Sections in the Territory. 2 Stat. 401 (1806). Eventually, in 1817, Mississippi was admitted as a State, and a further Land Sales Act provided for the survey and sale of those lands in the northern part of the new State that had not been covered by the 1803 Act. The 1817 Act provided that these lands were to be "surveyed and divided in the manner provided by law for the surveying of the other public lands of the United States in the Mississippi territory;" thus, the Act required that "the section No. 16 in each township ... shall be reserved for the support of schools therein." 3 Stat. 375 (1817). The Sixteenth Section lands and lands selected in lieu thereof were granted to the State of Mississippi. See Lambert v. State, 211 Miss. 129, 137, 51 So.2d 201, 203 (1951).
... .
From these historical circumstances, the current practice in Mississippi with regard to Sixteenth Section lands has evolved directly. Under state law, these lands, which are still apparently held in large part by the State, "constitute property held in trust for the benefit of the public schools and must be treated as such." Miss. Code Ann. § 29-3-1(1) (Supp. 1985). In providing for the operation of these trusts, the legislature has retained the historical tie of these lands to particular townships in terms of both trust administration and beneficiary status. Thus, the State has delegated the management of this property to local school boards throughout the State:... .
Papasan, 478 U.S. at 268-272, 106 S.Ct. at 2935-37, 92 L.Ed.2d at 220-23. Footnotes have been omitted from this quotation.[2]
Thus the origin of the school lands trust for the support of public schools goes back to the beginning of our country and antedates the formation of the State of Mississippi. These lands throughout the United States, as well as within our State, have always been held to be trust lands for the benefit of public schools. Miss. Code Ann. *6 § 29-3-1(1) (Supp. 1988), Turney v. Marion County Board of Education, 481 So.2d 770, (Miss. 1985), Tally v. Board of Supervisors of Smith County, 323 So.2d 547, 550 (Miss. 1975), Keys v. Carter, 318 So.2d 862, 864 (Miss. 1975), Washington County v. Riverside Drainage Dist., 159 Miss. 102, 131 So. 644, 645 (1931). The school lands trust was federally created and is federally enforceable. Papasan, supra, Plyler v. Doe, 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786, 794 (1982), Lassen v. Arizona, 385 U.S. 458, 460, 87 S.Ct. 584, 585, 17 L.Ed.2d 515 (1967), 36 Stat. 574 (1910) (Arizona and New Mexico); Turney v. Marion County Board of Education, 481 So.2d 770, 776 (Miss. 1985).
Title to all lands in the trust was granted to, and resides in, the State of Mississippi. Turney v. Marion County Board of Education, 481 So.2d 770, 776 (Miss. 1985); Tally v. Board of Supervisors of Smith County, 323 So.2d 547, 549-550 (Miss. 1975); Lambert v. State, 211 Miss. 129, 137, 51 So.2d 201, 203 (1951); Pace v. State ex rel Rice, 191 Miss. 780, 798, 4 So.2d 270, 274 (1941); Jefferson Davis County v. James-Sumrall Lumber Co., 94 Miss. 530, 535-36, 49 So. 611, 612 (1909); Jones v. Madison County, 72 Miss. 777, 800, 18 So. 87, 91 (1895). That title so resides has been affirmed in Papasan, 478 U.S. at 271, 106 S.Ct. at 2936, 92 L.Ed.2d at 222; See also Gaines v. Nicholson, 50 U.S. (9 How.) 356, 364, 13 L.Ed. 172, 176 (1850).
The State of Mississippi has historically managed its sixteenth section lands through local authorities, originally through the respective boards of supervisors, and more recently through the school boards. This Court has described the duties of such managing agents in Humble Oil & Refining Co. v. State, 206 Miss. 847, 41 So.2d 26 (1949). "As such Trustees they were required, like all other fiduciaries, to exercise a higher degree of care with reference to the administration of their trust than in the management of their own individual personal business, and furthermore, even than in attending to the general run of the county's business." 206 Miss. at 854, 41 So.2d at 27. As record titleholder, the State of Mississippi, through its managing or supervising agent, the Board of Education, has standing to bring or defend actions in federal or state courts respecting these trust lands, the same as any common-law trustee.
Common-law rules enforceable in the case of private trusts are applied to the public school lands trust. Keys v. Carter, 318 So.2d 862, 864 (Miss. 1975); Holmes v. Jones, 318 So.2d 865, 868 (Miss. 1975); United States v. Swope, 16 F.2d 215, 217 (8th Cir.1926). Common law rules of trust law have been applied to federal lands trust in various contexts. See, County of Oneida, New York v. Oneida Indian Nations, 470 U.S. 226, 233-37, 238, 246-48, 105 S.Ct. 1245, 1250-52, 1253, 1257-58, 84 L.Ed.2d 169, 178-80, 181, 186-87 (1985) (applying common law remedies because federal act did not establish comprehensive remedial plan).
At common law, one who holds as trustee is prohibited from giving away, appropriating to his own use, or otherwise, disposing of the corpus of a trust in derogation of the rights of the beneficiaries. This rule applies to the school lands trust. Tally v. Board of Supervisors of Smith County, 323 So.2d 547, 550 (Miss. 1975); Holmes v. Jones, 318 So.2d 865, 868-69 (Miss. 1975); See also, State v. Weiss, 706 P.2d 681, 683 (Alaska 1985) (relying on Restatement (2d) of Trusts 1959) (when protecting a federally created land trust); State v. University of Alaska, 624 P.2d 807, 813 (Alaska 1981) (relying on Scott, The Law of Trusts (3 ed. 1967), and Bogert, The Law of Trusts and Trustees, (Rev.Ed. 1978) when protecting a federally created land trust).
One important corollary of this rule is the continuing nature of the trustee's duty to manage the trust corpus so that the income therefrom is reasonably maximized. Restatement (Second) of Trusts, § 181 (1959). Indeed, where a reasonable yield is prevented by the trustee's wrongful conduct, this in no way serves to extinguish or ameliorate the trustee's continuing duty to produce a reasonable yield. *7 Bogart, The Law of Trusts and Trustees § 703 (2d rev. ed. 1982). The continuing duty of the trustee is enforceable at any time, 4 Pomeroy's Equity Jurisprudence §§ 1067, 1080 (5th ed. 1941); Restatement (Second) of Trusts, § 74, Comment c (1959) and may not be avoided because of past defaults. 4 Scott, The Law of Trusts, § 392 (3d ed. 1967). Johnson v. Hinds County, 524 So.2d 947, 955 (Miss. 1988) (failure of enforcement in the past does not render a statute inoperative).
These common law duties have been made more concrete with respect to the school lands trust in Mississippi, first by the Mississippi Constitution and, second, by legislative enactment. Today's appellants have recognized their responsibilities as trustee and as trust supervisors or managers, and it is in that vein that they have defended the original action to confirm title, asserted their counterclaim, and prosecuted the present appeal. What is important is that these duties of the trustee and as well, the applicability and enforceability of the law of trusts to the school land trusts date back to the year 1817, the date of the creation of the trust. The subsequent constitutional and statutory enactments are but federally permissible supplements and refinements of the law regulating the school lands trust.

IV.

WERE THE 1955 AND THE 1960 SIXTEENTH SECTION LEASES VOID FOR INADEQUATE CONSIDERATION?

A.
Assignments of error No. 1, No. 2, and No. 4 invoke Section 95 of the Mississippi Constitution and question the adequacy of consideration. Both leases were for a one time lump sum payment of $7.50 for a period of ninety-nine (99) years, or an annual payment of $.07575. The Plaintiff Thompson's position is that the statutory procedures were followed and that adequate consideration was paid; on the other hand, the School Board's contention is that the consideration is so grossly inadequate as to constitute a donation of public lands to private persons constitutionally prohibited, rendering the lease void from its inception. The Chancery Court found that in the post World War II period a depressed economy existed in Forest, Mississippi, with land values for the fee simple title extremely low and with land rental values even less. The court further found that, in light of the then existing economic conditions and land values and the condition of Lot 6, the consideration paid by Lackey was adequate under the applicable statutes and the state constitution. Thus the first issue to be analyzed is adequacy of consideration of the lease rental.
Two provisions of the 1890 Mississippi Constitution are applicable to our analysis. First is Section 95:
Lands belonging to, or under the control of the state, shall never be donated directly or indirectly, to private corporations or individuals... . Section 95, Mississippi Constitution.
Section 211 of the 1890 Constitution of the State of Mississippi states in part:
The Legislature ... shall provide that the sixteenth section lands reserved for the support of township schools, except as herewith provided, shall not be sold nor shall they be leased for along term than ten (10) years for lands situated outside of municipalities and for lands situated within municipalities for a longer term than ninety-nine (99) years, for a gross sum... .
Article 8, § 211 of the Constitution directs the legislature to enact statutory direction for the leasing of these public lands. This constitutional direction was amended in 1961 and in 1986.
The procedures for valuing and leasing at the time the leases were executed were provided by statute. In 1946 the Mississippi Legislature passed House Bill No. 63 which became Chapter 443 of the Laws of the 1946 Regular Session of the Mississippi Legislature. That statute provided, in Section 4, that three disinterested freeholders serving as appraisers would appraise the sixteenth section land to be leased and report to the Board of Supervisors. The Supervisors were then authorized to lease *8 the land for seventy-five percent (75%) of the appraisal value thereof.
In 1948 the Mississippi Legislature passed Senate Bill No. 292 which became Chapter 497 of the Laws of the 1948 Regular Session of the Mississippi Legislature. That statute amended the 1946 law and required that leases be issued for a "reasonable amount." The 1948 law continued the requirement for an appraisal by three disinterested freeholders who would make their recommendations to the Board of Supervisors for a gross sum which the Board would then determine if it was a reasonable amount.
Within this tangled web is also the 1978 Reform Act, Miss. Code Ann. § 29-3-1 (Supp. 1988), affecting the leasing of sixteenth section school lands, which sought to correct past abuses in rental determination. Changes of the Reform Act placed limits on lease terms, and included the payment of an annual rental with a rent adjustment clause every ten years on all leases except residential and farm-residential lands. This latter statute implements the trustee's continuing duties as described above. Not addressed by this opinion is the 1989 legislative enactment, Senate Bill 2780, the "Tidelands Act" passed since the filing of briefs by these litigants.

B.
Within this statutory framework in 1947 the Board of Supervisors of Scott County appointed three appraisers, T.G. McCormick, O.S. Redden, and V.R. Lackey, to make individual reports of appraisement upon several applications for Sixteenth Section Leases. That report stated that the three appraisers felt that it was necessary to "establish a basis upon which lands within the municipality should be valued to be released, or existing leases thereof extended 99 years." The conclusion of this report was that a fair market price for sixteenth section land was $10 per acre on undivided property and $10 per lot (less than one acre) on the subdivided property. This 1947 appraisal concludes with the statement that in the opinion of the three appraisers "there is no justification for other than a nominal value for even long term leases of sixteenth section lands in this city." (Emphasis added).
On April 4, 1955 H.L. Lackey applied to the Board of Supervisors of Scott County, Mississippi, for a 99 year lease of Lot 6. That application listed the total assessed value as fixed by the Board of Supervisors, in paragraph 4, at $3,200 with $3,000 being applied to improvements and $200 for the land. The assessed value of Lot 6 as fixed by the Mayor and Board of Aldermen, in paragraph 5, is for a total of $6,000 with the land being worth $2,000 of that total.
By order of the Board of Supervisors, O.S. Redden, T.G. McCormick and V.R. Lackey were appointed as appraisers, required by statute to be disinterested freeholders, to appraise the property and report to the Board of Supervisors. The statutory scheme of 1948 required that consideration be issued for a "reasonable" amount, rather than the former "fair market rental". These are the same three individuals that made the general appraisal in 1947 that all properties should be valued at $10 per acre and $10 per lot. These appraisers reported that Mr. Lackey should be charged a one-time payment of $7.50 as a fair gross sum rental for that property for a 99 year period or $.07575 per year. A lease was then issued by the Board of Supervisors to H.L. Lackey under the provisions of Chapter 497 of the Laws of the 1948 Regular Session of the Mississippi Legislature at a rate of $7.50 for 99 years.
The plaintiff's proof of adequate consideration was primarily directed toward the depressed economic conditions in Forest, as evidenced by the chancellor's finding, and of the intent of the legislature to promote industrial development. Plaintiff Thompson, as a former legislator, testified to this legislative intent. The proof showed without question that all Sixteenth Section Leases in Forest, regardless of size or location, were leased for a consideration of $7.50 for 99 years. Finding that citizens have a right to rely upon applicable statutory procedure for leasing Sixteenth Section land and be protected thereby, the Chancery Court confirmed the lease.
*9 The Court's finding that the Plaintiff relied upon existing statutory leasing procedures overlooks controlling legal principles. At common law no trustee has authority to lease real property held in trust for substantially less than the fair value thereof. Tally v. Board of Supervisors of Smith County, 323 So.2d 547, 550 (Miss. 1975). The trustee certainly has no authority to enter a long term lease at a nominal one time rental, so that the lease is tantamount to a gift. This principle has been embodied in this state's constitution which prohibits donation of public land no matter what legislative procedure is mandated. Miss. Const. Art. 4, § 95 (1890). This Court knows of no rule of law whereby the substantive prohibition of Section 95 may be violated if only certain forms or procedures are met.
Section 95 and its non-donation principle have full force and effect in the case of lands held by the state in trust for the schools, for in a sense all lands held by the state are held in trust, only some such as these are dedicated to more specific purposes. This Court has in the past repeatedly held Section 95 applicable to assets a part of the school lands trust. In Keys v. Carter, 318 So.2d 862 (Miss. 1975), for example, the Court stated:
The facts alleged in the bill, if supported by proof accepted by the chancellor as the trier of facts, would be capable of supporting a finding that the lease of this 320 acre tract for an annual rental of $170, although the fair value of the lease was $4,000 per year, amounted to an unconstitutional donation, as well as an appropriation of the property to "an object not authorized by law." In that event, the lease was and is void and may be attacked in this suit. See Saxon v. Harvey, 190 So.2d 901 (Miss. 1966) and Coleman v. Shipp, 223 Miss. 516, 78 So.2d 778 (1955).
Keys, 318 So.2d at 864. Holmes v. Jones, 318 So.2d 865, 869 (Miss. 1975) also held that leasing sixteenth section lands held by the state within the school lands trust for "a grossly inadequate consideration" was a violation of Section 95 of the Constitution. Edwards v. Harper, 321 So.2d 301, 303 (Miss. 1975) is to like effect, viz school lands having a fair market value of $22,500 where leased for ninety-nine years for $400 are deemed donated when scrutinized under Section 95. In Talley v. Board of Supervisors of Smith County, 323 So.2d 547, 550 (1975), this Court stated that "where the consideration paid for a lease [a rental of forty cents per acre] is so small as to amount to a donation of the property, the lease is void." See also Saxon v. Harvey, 190 So.2d 901 (Miss. 1966); Coleman v. Shipp, 223 Miss. 516, 78 So.2d 778 (1955). Although the School Board contends that this lease in question was void from its inception, this position is not entirely correct. This Court construes our former decisions to mean that the lease for an inadequate consideration is voidable and may be attacked for that reason by a school board. Upon a finding by a court of competent jurisdiction of inadequate consideration, the lease may be declared void.
Long before Keys, Holmes, Edwards, and Talley, which were decided in 1975, this Court was saying the same thing, finding time and again that grossly inadequate considerations constituted an unconstitutional donation of sixteenth section trust lands. In Koonce v. Board of Supervisors of Grenada County, 202 Miss. 473, 477-78, 32 So.2d 264, 265 (1947) this Court held that supervisors had no authority to sell sixteenth section trust property at such a grossly inadequate price as to violate Section 95 of the Constitution. Likewise, in State ex rel Kyle, Attorney General v. Dear, 209 Miss. 268, 279, 46 So.2d 100, 104 (1950), this Court held that it was beyond the power of the Board of Supervisors to sell sixteenth section timber for a grossly inadequate price as to constitute donation. See also State v. Dear, 212 Miss. 620, 630-31, 55 So.2d 370 (1951) (sale of sixteenth section timber by County Board of Supervisors for $500.00 and which was resold for $4,000.00 held, prima facie, consideration was grossly inadequate). Likewise, this Court held that "value does not have to be proved with certainty as to the amount in order to show that the consideration is *10 grossly inadequate." State v. Dear, 209 Miss. 268, 46 So.2d 100, 105 (Miss. 1950).
When reviewing on appeal factual determinations made by a trial judge sitting without a jury, this Court employs the substantial evidence standard. UHS-Qualicare v. Gulf Coast Com. Hosp. 525 So.2d 746 (Miss. 1987); Cotton v. McConnell, 435 So.2d 683, 685 (Miss. 1983). In the words of this Court in Tally v. Board of Supervisors of Smith County, "We can take judicial notice that little, if any, land in the State of Mississippi could have been purchased on the open market for its reasonable value at such a low price in [1955 or 1960]." 323 So.2d at 551. Even the assessed value of Lot 6 without improvements was $2,000.00, making clear that the $7.50 lease rental was but a miniscule fraction of fair market value. The Chancery Court's finding of fact that an adequate consideration was paid was clearly an erroneous finding and was manifestly in error. See also Estate of Robinson v. Gusta, 540 So.2d 30, 33 (Miss. 1989); Matter of Estate of Varvaris, 528 So.2d 800, 802 (Miss. 1988); State ex rel Coleman v. Dear, 212 Miss. 620, 633, 55 So.2d 370, 375 (1951).
On the authority of Section 95 and the many cases applying it to sixteenth section lands, the Court holds that the 1955 and 1960 leases were voidable, and at the election of the state as trustee, may be attacked. Keys, supra; Talley, supra. The School Board as managing agent has so elected and would clearly be entitled to judgment to that effect were Lot 6 still held by its original lessee. H.L. Lackey, however, is dead, and his heirs no longer hold the lease. The Court today is concerned with the rights of William C. Thompson, the current leaseholder.
It is the law in this state that ordinarily one who acquires real property takes it subject to whatever claims lie against it and whatever defects there may be in the title. Hardy v. Wheaton, 374 So.2d 790, 791 (Miss. 1979). The purchaser steps into the shoes of the seller. To the extent that one is a bona fide purchaser, however, an innocent purchaser without notice and who pays fair value, he takes free and clear of hidden claims or title defects. Collier v. Shell Oil Co., 534 So.2d 1015, 1018 (Miss. 1988).
In this case appellee Thompson bought the leasehold interest in 1985 at foreclosure sale for a consideration of $7,000.00; he asserts that the existing structure on the property was worthless and a liability for him. But to him it was worth $7,000.00 in 1985 for the balance of approximately seventy-five (75) years. The leasehold value placed on the property by the Board of Supervisors in 1955 and 1960 was a one time payment of $7.50 for ninety-nine (99) years. A comparison of these dates and values, although not an appraisal, speaks volumes to the point of adequacy or inadequacy. A consideration of $7.50 for ninety-nine (99) years is less than a dime a year in rental. Nothing in the record suggests that the economy in Forest and Scott County in 1955 and 1960 was that depressed! The City of Forest had assigned the lot an assessed value of $2,000.00 without considering the improvements. The lease rental paid by Lackey was a mere 0.375 per cent of assessed value! Moreover, the record is wholly devoid of evidence that non-sixteenth section real property of otherwise comparable kind and quality had a fair market value anything like so low.
The consideration Lackey paid for this lease is so grossly inadequate as to shock the conscience and to defeat any challenge even of one otherwise claiming the status of a bona fide purchaser. It is not a hidden title defect, but is and has been a matter of public record, so openly blatant as to put any purchaser on notice of a possible defect in the seller's (here the trustee's) title. Peoples Bank & Trust Co. v. L & T Developers, 434 So.2d 699, 708 (Miss. 1983); West Center Apartments, Ltd. v. Keyes, 371 So.2d 854, 856 (Miss. 1979). The tax assessments of city and county gave notice of value that should have suggested a far higher rental was required to meet the constitutional mandate of non-donation. Even the appraiser's report stated that only a nominal value was used. Thompson was charged with all of this knowledge.
*11 As was stated in Baldwin v. Anderson, 103 Miss. 462, 60 So. 578 (1913):
Inadequacy of consideration, whether in the deed to the purchaser or in the deed to his grantor, is material in ascertaining whether a purchaser shall be charged with constructive notice of defects in the title; and the fact that such consideration is grossly inadequate may under some circumstances alone be sufficient to charge a purchaser with notice of defects in the title. This land, according to the testimony of appellee, is worth $1,000; according to that of appellant $1,600. The consideration paid by Mrs. Glover was $10 cash, and the payment of the note due the Mortgage Company for $350, which note was not then due and would not become due for three and one-half years. Accepting as true the value placed on the land by appellee, the consideration agreed to be paid by Mrs. Glover therefor amounted to only one-third of its value. The sale of land for one-third of its value is, to say the least, unusual, and the recital of such a consideration in a deed, coupled with the fact that the consideration agreed to be paid was the payment of a note of the grantor, which would not become due for three and one-half years, is sufficient to suggest to the mind of the average man that the entire consideration was not expressed in the deed, or that there was a defect in the title, and thus put him upon inquiry before purchasing the land.
* * * * * *
A slight investigation would have conducted him to a knowledge of the true state of the title; consequently, he must be charged with knowledge thereof, for "whatever is enough to excite attention, or put a party on inquiry, is notice of everything to which such attention or inquiry might reasonably lead." Parker v. Foy, 43 Miss. 260, 5 Am.Rep. 484.
103 Miss. at 467-68, 60 So. at 580. See also, Annotation, 42 A.L.R.2d 1088, 1089-90 (1955); 77 Am.Jur.2d Vendor and Purchaser § 696 (1975).
Caveat emptor still reigns at foreclosure sales. Feldman v. Rucker, 201 Va. 11, 20, 109 S.E.2d 379, 385-86 (1959); Ivrey v. Karr, 182 Md. 463, 473, 34 A.2d 847, 852 (Md. 1943); Adams v. Boyd, 332 Mo. 484, 490, 58 S.W.2d 704, 707 (1933); American Law of Property, § 16.211. (1952). If Haden's signature had been forged to the deed of trust, Thompson would have taken nothing at the trustee's sale. Woodson v. Jones, 203 Miss. 152, 155, 33 So.2d 316 (1948). And if the Board of Supervisors had illegally leased the property to Lackey, the same conclusion would obtain. Thompson is not a bona fide purchaser. He was on actual or constructive notice that the $7.50 rental Lackey paid in 1955 and again in 1960 was grossly inadequate consideration. That he was willing to pay $7,000.00 for the property speaks volumes, particularly where, as Thompson testified, he considered the improvements on the lands a liability and not an asset. In State ex rel. McCullen v. Adams, 185 Miss. 606, 188 So. 551 (1939) the Court said, "since John Jordan was sufficiently familiar with the value of the land as to be willing to pay a cash consideration of $1,600 therefor" he was put on notice of the grossly inadequate price of $160 paid for the land by Adams in purchasing the same from the State Land Commissioner. Adams, 185 Miss. at 614, 188 So. at 553. And in State ex rel. Kyle v. Dear, 209 Miss. 268, 46 So.2d 100 (1950) the Court held that the purchaser was put on notice that $500 was a grossly inadequate consideration for sixteenth section timber "when the said defendant had determined that the timber was worth at least $4,000". Dear, 209 Miss. at 278, 46 So.2d at 104; see also, State ex rel. Coleman v. Dear, 212 Miss. 620, 631, 55 So.2d 370, 374 (1951).
In sum, this Court answers the issues posed by this assignment and holds that the Chancery Court manifestly erred when it found the consideration for the lease not grossly inadequate; further, this Court holds that, as a matter of law, a one time gross sum payment which amounts to $.07575 per year consideration is grossly inadequate and amounts to a donation of public lands prohibited by the constitution and trust law. Mere compliance with statutory formalities and procedures does not vitiate substantive violation of constitutional prohibitions. Under the authority of *12 Mississippi Constitution Section 95, the common law of trusts regulating the duties of trustee, and prior decisions of this Court, this Court reverses the judgment below and voids the lease of appellee Thompson, but under the hereinafter stated conditions.

C.
In making this decision, the Court is aware of the proof that all sixteenth section leases in Scott County were for $7.50 for 99 years. Although the law has been clear for many years, the Court is cognizant of the fact that sixteenth section lands in many other counties have in the past been leased for nominal rentals. Indeed, there has been a century of disregard of this constitutional mandate and of widespread and long continued acceptance of this practice by former officials. Not unmindful of the impact of this decision, the Court considers it appropriate to repeat a remark made in Transamerica Co. v. Paine Supply Co., 194 So.2d 490, 491 (Miss. 1967) that "we know of no way in which custom can change the law as written." Johnson v. Hinds County, 524 So.2d 947, 955 (Miss. 1988) and State Tax Commission v. Fondren, 387 So.2d 712 (Miss. 1980), are to like effect.
However, our consideration does not end here. This case is to be remanded to the Board of Trustees of the Forest Municipal Separate School District Board for a new determination of the present rental value by a competent appraiser under Miss. Code Ann. § 29-3-1 et seq., the 1978 Reform Act. Equity dictates, however, that while the appraisal process is in process that appellee shall have the use of the premises in question and the right of first refusal of the new lease and the right to meet the best bid when the rental value is determined. It must be remembered that this action is severe and that leaseholders, lienholders, and title insurance companies must all be considered. Having rights and liabilities that flow from their past involvement in this unlawful practice of nominal rentals on sixteenth section trust lands, these third parties' positions must be taken into account. The right of a lienholder is not present in this case, but that equitable question will have to be addressed in another factual situation.
This Court favors the repose of title in real estate transactions and recognizes that this decision will involve an adjustment period. Section 95 has been in the Constitution since 1890. However, inadequacy of consideration may be challenged in the case of leases entered both before or after the Reform Act of 1978. Miss. Code Ann. § 29-3-25. Nothing in this opinion shall be considered to indicate the present rental value, except as to the inadequacy of the present lease rental. However, as appellant Thompson has testified in this suit, the legislature in its 1940's enactments attempted to promote development of its sixteenth section lands. In fact, the policy of the State of Mississippi with its own lands was to make every effort to return forfeited tax lands to private ownership and considered economic development as a factor in sale pricing. This Court recognizes that a public policy of making all reasonable efforts to keep sixteenth section lands leased so that they might be developed and produce revenue from taxation is not an unworthy goal, and this policy may have influenced the past officials in this case, dealing with trust lands. Rental values are determined by a number of factors and the 1947 appraisers consideration of the economic development was warranted. Dodds v. Sixteenth Section Development Corp., 232 Miss. 524, 99 So.2d 897, 904 (1958). However, its emphasis must not overshadow constitutional mandates. Mississippi Constitution § 95. State ex rel Kyle v. Dear, 209 Miss. 268, 279, 46 So.2d 100, 104 (1950).
The case is remanded to the Board of Trustees of the Forest Municipal Separate School District for action consistent with 1978 Reform Act.

V.

WERE LESSEES OF SIXTEENTH SECTION LEASES DISINTERESTED FREEHOLDERS WHO MAY APPRAISE SIXTEENTH SECTION LAND?
Assignments No. 3 and No. 5 raise the issue of whether the appraisement of *13 1955 and the 1947 general appraisal were performed by disinterested freeholders.
In 1955, the Board of Supervisors appointed as appraisers O.S. Redden, T.G. McCormick and V.R. Lackey, and stated, inter alia, that they were disinterested freeholders. V.R. Lackey and the original 1955 and 1960 leaseholder, Harold Lackey, were cousins.
The appellants offered evidence that the three appraisers were themselves holders of sixteenth section land leases at the times of the 1947 and 1955 appraisals, and that there was a renewal of their leases after the 1947 appraisal. Thompson objected to the materiality and relevancy of the evidence and pointed out that the appraisers only made recommendations to the Board of Supervisors, which Board then determined whether the recommendation was a reasonable gross sum, and that Miss. Code Ann. § 29-3-7, the adverse possession statute, cures any problem. The trial court sustained the objection, but accepted the proffer by the School Board. The court noted that the acquisition of the leases by the appraisers was probably a result, rather than a cause of the 1947 appraisal amount. The trial court found them to be well qualified and would not assume that their leases affected their professional conduct. There is no allegation of fraud, their service was noteworthy and honorable. There is absolutely no challenge to their honesty or integrity.
The term "disinterested" has been defined as follows: "Not concerned, in respect to possible gain or loss, in the result of the pending proceedings or transactions; impartial, not biased or prejudiced." Black's Law Dictionary 421 (5th Ed. 1979). This Court has defined the words "interested parties," in the context of a proceeding to contest the validity of a will, as "parties who have a pecuniary interest in the subject of the contest." Provenza v. Provenza, 201 Miss. 836, 29 So.2d 669, 670 (1947). This Court has also held that a mother-in-law is not a "disinterested person" within a court rule requiring a certificate to be made by a disinterested person. Deer Island Fish & Oyster Co. v. First National Bank of Biloxi, 172 Miss. 284, 159 So. 656 (1935).
Other courts have held that members of a planning board should not sit in consideration of any matter in which they are personally interested. It has been held that self-interest of one member of a planning board infects the action of the other members, regardless of their disinterestedness. Hochberg v. Freehold, 40 N.J. Super. 276, 123 A.2d 46; Pratt v. Mayor & Council of Dunellen, 9 N.J. 548, 89 A.2d 1, Zell v. Roseland, 42 N.J. Super. 75, 125 A.2d 890.
The defendant Board attempted to introduce the above evidence that the appraisers were not disinterested, and the proffer by the Board showed that the three appraisers held Sixteenth Section Leases. The exclusion of this testimony was preserved by the proffer. Murray v. Payne, 437 So.2d 47 (Miss. 1983). This Court holds that the evidence was relevant and should have been admitted, and having reviewed that evidence which was proffered, holds that the appraisers were not disinterested freeholders since they held Sixteenth Section Leases. This is an additional ground for voidance of the leases in question.

VI.

DID THE CHANCELLOR ERR IN HOLDING THAT THE STATE, ACTING THROUGH ITS SCHOOL BOARD, WAS EQUITABLY ESTOPPED?
The chancellor held that under Miss. Code Ann. § 29-3-7 and § 29-3-52, the School Board was equitably estopped from asserting inadequacy of consideration. The pertinent parts of those sections are:
§ 29-3-7 Adverse possession.
Adverse possession for a period of twenty-five years, under a claim of right or title, shall be prima facie evidence in such case that the law authorizing the disposition of the lands has been complied with and the lease or sale duly made. If the claim be under a lease, the time at which the lease expires shall be fixed by the court.

*14 29-3-52 Prima facie validity of leases executed and recorded in substantial conformity with law.
Any lease of sixteenth section lands, or lands granted in lieu thereof, executed and recorded in substantial conformity with the provisions of this chapter shall be deemed to be prima facie valid, and defects in ministerial or procedural acts alone shall not affect the validity of any such lease, as far as a bona fide purchaser or encumbrancer for value of any such lease is concerned. Any such purchaser or encumbrancer shall be entitled to rely upon the validity of any such lease insofar as the interest of the state or any political subdivision thereof, the public, or any school district is concerned.

Nothing in this section shall prohibit any party from challenging the validity of any lease on the grounds of inadequacy of consideration given for the lands involved in the lease. (Emphasis added).
Mississippi law is clear that the state is not subject to any statutes of limitations nor may the state lose property by adverse possession. Miss. Const. Art. 4, § 104 (1890); Cinque Bambini Partnership v. State, 491 So.2d 508, 521 (Miss. 1986); Board of Education of Itawamba County v. Loague, 405 So.2d 122, 124-25 (Miss. 1981); Gibson v. State Land Commissioner, 374 So.2d 212, 217 (Miss. 1979). The principle that a governmental entity is not chargeable with the laches of its officials is also well settled. Monroe County Board of Education v. Rye, 521 So.2d 900, 908 (Miss. 1988). Chill v. Mississippi Hospital Reimbursement Commission, 429 So.2d 574, 585 (Miss. 1983); Alexander v. Mayor and Board of Aldermen of City of Natchez, 219 Miss. 78, 94, 68 So.2d 434, 441 (1953); Aetna Insurance Co. v. Robertson, 131 Miss. 343, 377, 94 So. 7, 10 (1922); City of Bay St. Louis v. Hancock County, 80 Miss. 364, 371-72, 32 So. 54 (1902); Josselyn v. Stone, 28 Miss. 753, 763 (1855).
On the other hand, the state and its political subdivisions "may be equitably estopped under the proper circumstances." Monroe County Board of Education v. Rye, 521 So.2d 900, 908-909 (Miss. 1988); Suggs v. Town of Caledonia, 470 So.2d 1055 (Miss. 1985); Covington County v. Page, 456 So.2d 739 (Miss. 1984); State v. Stockett, 249 So.2d 388 (Miss. 1971). But no estoppel may be enforced "against the state or its counties where the acts of their officers were unauthorized." Oktibbeha County Board of Education v. Town of Sturgis, 531 So.2d 585, 589 (Miss. 1988). The Oktibbeha County case concerned an invalid sixteenth section lease and is controlling today.
The state is not bound by the action of the Board of Supervisors in 1955 and 1960. On at least two occasions, this Court has held:
Private individuals who negligently fail to ascertain the value of their own property may, in the absence of fraud, bind themselves by conveyances thereof for a grossly inadequate price, but this is not true of public officials dealing with property held by the state, either in fee simple or as trustee, and especially as trustee where the price is so grossly inadequate as to virtually amount to a donation, in violation of our State Constitution.
State ex rel Kyle v. Dear, 209 Miss. 268, 279, 46 So.2d 100, 104 (1950); Koonce v. Board of Supervisors of Grenada County, 202 Miss. 473, 478, 32 So.2d 264, 265-66 (1947); See also, State ex rel Coleman v. Dear, 212 Miss 620, 632, 55 So.2d 370, 374 (1951).
In Pace v. State ex rel Rice, 191 Miss. 780, 4 So.2d 270 (1940), this Court held that:
The State cannot abdicate its duty as trustee of property in which the whole people are interested, such as sixteenth section land held by the state as trustee for schools, any more than the state can surrender its police power in the administration of government and in the preservation of peace and order.
Pace, 191 Miss. at 804, 4 So.2d at 277, citing an abundance of United States Supreme Court decisions. The point was repeated in State ex rel Coleman v. Dear, 212 Miss. 620, 630, 55 So.2d 370, 374 (1951). *15 See also American Oil Co. v. Marion County, 187 Miss. 148, 192 So. 296 (1939); Gift v. Love, 164 Miss. 442, 144 So. 562, 86 A.L.R. 63 (1932); Eastman Oil Mills v. State, 130 Miss. 63, 93 So. 484 (1922). See also Lancaster v. City of Columbus, 333 F. Supp. 1012 (N.D.Miss. 1971); Reliance Mfg. Co. v. Barr, 245 Miss. 86, 146 So.2d 569 (1962); 28 Am.Jur.2d Estoppel and Waiver, § 127 (1966); 31 C.J.S. Estoppel §§ 142-43 (1964).
Having held herein that the consideration was grossly inadequate, this Court also holds that equitable estoppel cannot be applied against the State in this instance. The chancellor is reversed on this issue.

VII.

DID THE TRIAL COURT ERR IN AWARDING ATTORNEY'S FEES AGAINST THE SCHOOL BOARD?
On a finding of frivolousness, the chancellor found the School Board's defense to be totally without merit and warranted an award of seven thousand five hundred dollars ($7,500.00) attorney's fees under M.R.C.P. Rule 11(b) as sanctions. Such sanctions may be imposed only where a claim or defense is frivolous or asserted for harassment or delay. Tricon Metals & Services, Inc. v. Topp, 537 So.2d 1331, 1334-35 (Miss. 1989); Dethlefs v. Beau Maison Development Corp., 511 So.2d 112, 118 (Miss. 1987). The area of sixteenth section trust lands is one of the most litigated issues in the state for the past eight years, and it has received extensive media coverage for the same period. Past abuses in management of trust lands have given rise to this renewed interest to untangle a complex and involved public problem for the benefit of public schools. This public concern is meritorious; it is not an issue without merit.
Having found that the lease in question is void, this Court has held the School Board's position to be meritorious. The award of attorney's fee must be reversed and rendered.

VIII.
Finding that the amount of consideration was inadequate as a matter of law, the Court does not address the failure of the trial judge to permit the School Board's expert appraisal witness to testify. The proof that was introduced was sufficient to make this legal determination without further proof from appellant Board. Therefore, assignment No. 8 is not addressed. The Court upholds the chancellor's finding regarding the issue of waste. Assignments 9 and 11 are not addressed.
REVERSED AND RENDERED AS TO INVALIDITY OF LEASE.
AFFIRMED ON THE ISSUE OF WASTE.
REVERSED AND REMANDED TO FOREST MUNICIPAL SEPARATE SCHOOL BOARD OF TRUSTEES FOR APPRAISAL PROCEDURE.
REVERSED AND RENDERED AS TO ATTORNEY'S FEES AGAINST FOREST MUNICIPAL SEPARATE SCHOOL BOARD OF TRUSTEES.
DAN M. LEE, P.J., and ROBERTSON, ANDERSON and BLASS, JJ., concur.
HAWKINS, P.J., and SULLIVAN, J., dissent.
ROY NOBLE LEE, C.J., and PITTMAN, J., not participating.
HAWKINS, Presiding Justice, dissenting:
I respectfully dissent.
I would affirm the chancery decree confirming William C. Thompson's leasehold interest for the remainder of its term.
There is just one section of the Mississippi Constitution which deals with leasing sixteenth section lands, Art. 8, § 211. This case is not about any violation of § 211.
At the times the leases in this case were executed, only two Acts of the Legislature embraced this subject, Ch. 497, Laws 1948 and Ch. 590, Laws 1956. There is no question but that these Acts were in full compliance with § 211, and that they authorized these leases. The Constitutional and statutory *16 provisions were faithfully followed. If there were any violation of the letter of § 211 or any statute enacted thereunder, of course there would be no alternative to holding that leaseholder Thompson must suffer the consequences.[1]
But, that is not this case.
Nor is this a case of fraud or deceit of any kind. H.L. Lackey, the original leaseholder, was truthful and accurate in each and every statement he made in his applications.
But, the majority has decided to be a fact finder, and holds that the payment for the lease of one-twelfth an acre was so grossly inadequate as to be a "donation" of public land in violation of Art. 4, § 95, and is therefore void.
This finding is 30 years after the fact, when there is no possible way the majority can know the conditions, reasons or circumstances under which these leases were executed (except from this record, which supports an entirely different result).
The inhabitants and taxpayers of the Forest Municipal Separate School District, the beneficiaries and the only persons affected, have not seen fit to utter one whimper of protest in all these years.
This is ignored by the majority.
Also ignored by the majority is that at least 441 other leases of other parcels of this sixteenth section in the late 1940s and 1950s paid exactly the same rental as Thompson's predecessor lessee H.L. Lackey: $7.50. The majority denigrates an entire generation of this school district's citizenry who studied, passed upon and approved this method of dealing with sixteenth section property in their community.
At various times in our State's history there have been certain towns specially favored with a concentration of outstanding lawyers. It so happens that this period of Forest's history had an especially strong Bar, such as few towns its size achieve, and unmatched since. From my own memory I can recall Frank F. Mize, J. Knox Huff, Percy M. Lee, O.B. Triplett, Jr., A.W. Cooper, all outstanding lawyers with statewide reputations for ability and integrity. "Donate" means to "give" with no expectation of return. State v. Southern Pine Co., et al., 205 Miss. 80, 38 So.2d 442 (1949). I find it difficult to conceive men of this caliber so bereft of common sense and everyday wisdom that they would sit idly by and see their community "give" any piece of public property away, much less by wholesale.
In the background of these leases were the following factors:
1. This sixteenth section was in the corporate limits of Forest.
2. Although the United States had just won a great war, in the decade following World War II Forest had a severely depressed economy, a condition common to a host of other small towns in this State. (This is difficult for any person under 50 to believe, and apparently some older have forgotten it.)
3. The Forest civic leaders presumably wanted to preserve their town, keep the people living there and operating their businesses there.
4. The homeowners and businessmen of the town, who had their life savings in their homes and businesses, were faced in the 1940s and 1950s with expiration of century old leases.
There was not much job or business opportunity in Forest, to begin with. And, a lease of a sixteenth section parcel is not an attractive investment when there is an alternative.
The civic leaders used their best judgment and determined the best way to encourage people to continue living on this sixteenth section and owning and operating businesses on it was to give the longest term leases authorized by law, and at as modest a rental as would be authorized by law. That is why this rental was authorized.
*17 What did town fathers expect in return? I do not know what they realistically expected with the extant conditions, but they hoped to somehow try and salvage their town in bleak and unpromising conditions. If they saved their town, located largely on this sixteenth section, then the school district would have ad valorem taxes it needed, jobs and productive citizens, and hopefully a good school. If their town died, so did any quality school.
We should not overlook that in the 1940s and into the 1950s well over ninety percent of all the revenue supporting municipal separate school districts came from ad valorem taxes in the district.
In an oil gas lease, timber sale, or agricultural lease on sixteenth section land, the school district can expect no more than its lease rental. There is no other income to the school from such land.[2] This is not true with a land lot in a municipality.
In a town the trustees should certainly be interested in the use of the property, not simply the rental, because the use of the property affords tax revenue and supports the town. Simply put, the officials' duty was to make Lot 6 and other lots in Forest's sixteenth section "productive." II A.W. Fratcher, Scott on Trusts, § 181, 4th ed. (1987).
Making these lots "productive" meant getting people to live on them, build homes on them, construct businesses on them as well as produce ad valorem tax revenue (otherwise non-existent), and thereby support and enrich the school and town. Used in this sense, the supervisors and school district leaders acted in the best and highest traditions of trustees. This is the distinction the majority ignores.
The benefits a school might derive from a sixteenth section town lot are not limited to a lease rental. If the lot is in a residential area, the school district wants some person to build or maintain a home there, raise his family, be a productive local citizen paying taxes (including ad valorem). If in a commercial area, the district wants some person to be willing to put or maintain a business there, give employment, create jobs, pay taxes (including ad valorem). In this manner the community and school district are enriched and blessed.
What is wrong with civic leaders, faced with a stagnant, depressed community, thinking beyond simply getting a one-time rental (which they might not get, anyway, simply because it is sixteenth section land), to all the other factors which build and maintain a town? The fate of a town and its schools are inextricably interwoven. How can you have a good municipal school unless the town is economically healthy?
In any event, the leaders of Forest and Scott County made this decision forty years ago as to this sixteenth section in Forest. They made the decision; they and their descendants have lived with it without complaint or dissatisfaction. Outside agitation has created this contest. We should abide by the judgment call made forty years ago by good citizens, and let these leases rest in peace.
A sixteenth section should be a blessing to its school. The majority had made Forest's sixteenth section a curse.

FACTS
On May 9, 1859, the Board of Police of Scott County executed a 99-year lease to the Northeast Quarter (NE4) and the East Half of the Northwest Quarter (E-1/2 NW-1/4) of Section 16, Township 6, Range 8 East to C.W. Taylor, James C. Harper, R.E. Harper and A.L. Harper. The consideration for this lease was $88.00, payable in four annual installments at the legal rate of interest.[3] The court square and almost the entire business section of Forest was located on this Taylor, et al tract, and almost the entire town was located on this land, and the remainder of this sixteenth section. Block 7 of the Original Survey of Forest is on the East side of the court square. The section line dividing sections *18 15 and 16 runs through the extreme East side of Block 7, with almost all of the block being in section 16.
Forest and Scott census figures are as follows:

 FOREST SCOTT COUNTY
 YEAR POPULATION POPULATION
 1890 547 11,740
 1900 761 14,316
 1910 1,136 16,723
 1920 1,188 16,420
 1930 2,176 20,914
 1940 2,735 23,144
 1950 2,874 21,681
 1960 3,917 21,187
 1970 4,085 21,369

It is obvious from the above census that many people had their homes and businesses on sixteenth section land under leasehold interests.
As the expiration date of the 1859 lease (or leases) approached, there was an exodus from section sixteen to outlying areas. The town expanded its corporate limits in all directions from this sixteenth section. Presently the corporate limits are expanded to the East and to the South, joining Interstate 20, encompassing two entire additional sections, and large portions of several more.
The maximum term for a lease under § 211 of the Constitution of 1890 was 25 years. In 1944 the people ratified an amendment to § 211 which authorized leasing lands within municipalities for a period of 99 years for a gross sum rental. In 1946 the Legislature passed Chapter 443, Laws 1946, a comprehensive Act dealing with sixteenth sections, covering leasing procedures, sales of timber, leasing for oil and gas, and setting forth maximum lease periods. Section 3 of the Act prohibited leasing the land for less than 75% the fair market value.
Pursuant to this Act the board of supervisors of Scott County appointed T.G. McCormick, O.S. Redden and V.R. Lackey to make an appraisal of the fair market value of the land in this section.
The report first pointed out that the U.S. Forest Service in the '30s purchased 88,000 acres in Scott County at $3.80 per acre. By 1946 there had been a 118% increase, making land value $8.28 per acre, and farm land was selling in the county at $10.00 per acre. Agricultural land in Forest was assessed at $10.00 per acre. They felt a fair market price for land was $10.00 per acre on undivided property, and $10.00 per lot (less than an acre) on subdivided property.
They recognized the purpose of the trust in leasing the land for 99 years was to secure an educational fund, and that the beneficiaries were generally the inhabitants of the township. They noted that the Forest Municipal Separate School District comprised approximately 62 square miles in six townships, which directly benefited "from the large ad valorem levy of tax upon the improvements located upon the 16th section within the Forest city limits." They noted that the school district received no part of the state equalizing fund, and the state only contributed to the per capita fund, the same as made in larger and wealthier cities. The report concluded:
Last year tax revenues of more than $70.00 per acre were received from ad valorem levies; and it is a known fact that large tax values will be added in improvements upon these 16th Section lands when lease extensions under the Act are obtained.
Therefore, we respectfully submit that the purpose of the trust would be greatly furthered by encouraging the extension of present leaseholds on these lands for the longest possible time and for a nominal consideration. To illustrate, the application of W.R. and Joe S. Hunt herewith filed is to extend the leasehold on an unimproved lot which heretofore has had a tax valuation of only $800.00 for state and county tax and $2200.00 for city and school district, and which in consideration of the extension of said leasehold for a 99 year period the applicants propose the erection of a $47,500.00 building. The establishment of a business commensurate with the indicated improvements also is assured.
Finally, in our opinion there is no justification for other than a nominal value for even long term leases of 16th Section lands in this city.
*19 The views expressed in the appraisal report represented the consensus of the thinking of leaders in the community in the late 1940s and the 1950s: lawyers, public officials, educators, bankers and businessmen.
In 1948 the Legislature passed still another comprehensive Act dealing with sixteenth section lands, Chapter 497, Laws 1948, also specifically authorizing the leasing of lands within municipalities for a term not exceeding 99 years for a gross sum. Section 5 required the board of supervisors to appoint three disinterested freeholders as appraisers, to report to the board their recommendations for a gross sum should the land be leased for 99 years, following which the board should determine if it was a reasonable amount. Any decision made was subject to appeal to the circuit court. The requirement of the 1946 Act that the land must be leased at no less than 75% of its fair market value was removed. No requirement as to fair market value was in the 1948 Act.
On April 4, 1955, H.L. Lackey, in compliance with Chapter 497, Laws 1948, applied for a 99-year lease on Lot 6 in Block 7 of the Original Survey, a lot 85 feet long East and West, and 40 feet wide North and South. The application showed the county assessment to be $200 for the land and $3,000 for improvements, and city assessment to be $2,000 for the land and $4,000 for the improvements. A gasoline service station built some years previously was on the lot. The board appointed three appraisers who reported to the board that $7.50 was a fair and reasonable gross sum rental. Then, pursuant to board order, on May 2, 1955, the president of the board executed a 99-year lease to Lackey.
There was a further amendment to Section 4 of Chapter 497, Laws 1948, Chapter 230, Laws 1956, appearing as Section 6597-03 in Recompiled Volume 5 of the 1942 Code. Section 4 as amended gave the holder of a lease, at its expiration, exclusive right to extend an existing lease as could be agreed upon between the holder and the board of supervisors for a period not exceeding 99 years on land with a municipality.
Lackey made another application for a long-term lease, and again three freeholders found $7.50 to be a fair gross rental. Pursuant to a board order, the president of the board executed a 99-year lease to Lackey on July 5, 1960.
There is no question but that the statutory procedures were scrupulously followed in these leases. Lackey's applications were accurate and truthful.
If the service station operated at all after Lackey acquired the property, it was only for a year or two. For the most part over the years the property was vacant. An insurance agent rented the building, which had no toilet facilities, for a short while. Lackey died intestate and his two heirs-at-law conveyed his interest to Kenneth Darrel and Sybil R. Haden, who executed a deed of trust as security for the purchase price. The Hadens defaulted, and there was a trustee's sale to William C. Thompson, a local attorney, on January 25, 1985, for $7,000.
Thompson owned a law office building on the lot adjacent to Lot 6 and, because his son was joining him in his law practice wanted to expand his facilities. Prior to this he had no interest in the property and had consistently rejected Lackey's numerous entreaties to him to buy the property.
He initially thought he could use the old building on the lot, but found it so deteriorated as to be worthless. There was an old rusted wash rack on the lot which Thompson removed. He also had to dig the tanks out of the ground. Thompson thus had spent an additional $13,000, making his total investment approximately $20,000.
This area of downtown Forest had by then been eviscerated of commercial business. Only street parking was available, and most spaces were taken either by county employees or persons having business in the courthouse. The court square in Forest is smaller and more cramped than most small town squares. Law offices continued to use this part of town, and that was about it. Thompson did, however, want to *20 make a substantial investment in a building, the estimated cost by his architect being $167,000. Following purchase of the property, Thompson had occasion to discuss his plans with his fellow church member Richard C. Hill, Superintendent of School District, who was pleased at the prospect of valuable property being added to this deteriorating area. Thompson had upon several occasions on behalf of clients filed title confirmation suits on leasehold land in Forest. Following a conversation with the county superintendent, Thompson prudently decided he should get his title confirmed in court before spending $167,000. On March 17, 1986, he filed a bill of complaint in the chancery court against the superintendent and members of the board of trustees of Forest Municipal Separate School District, and president and members of the board of supervisors, and the county superintendent of education and county board of education to confirm the remainder of the 99-year lease executed in 1960, pursuant to Miss. Code Ann. § 29-3-103. The bill recited the facts relative to Lackey's acquiring the leaseholds in 1955 and 1960.
In 1978 the Legislature passed another comprehensive Act dealing with sixteenth section lands, Chapter 525, Laws 1978, Miss. Code Ann. § 29-3-1, et seq. (1988 Supp.) The Act classifies various types of sixteenth section land, sets out maximum lease terms, and provides for fair rentals. The Act has no provision in it, however, requiring school districts to examine school leases executed prior to 1978.
A parallel development, of which Thompson seems to have been unaware prior to filing suit, Hill and the trustees had received letters from the office of the secretary of state mandating that they review all leases executed prior to 1978 in Forest as to adequacy of consideration, and if the consideration was inadequate to "correct" them.
Following this prompting by the secretary of state's office, in April, 1985, the school district employed Petroleum Land Services, of which John Ed Ainsworth was general manager, to make a title search on all sixteenth section leases in Forest, and to render advice to the district.
Ainsworth was state land commissioner from 1976 through 1979 and was active in drafting and promoting passage of the 1978 Act. The state land commissioner's office was abolished during Ainsworth's term and all its duties transferred to the secretary of state.
Hill was of the opinion that around 600 leases in Forest had been executed prior to 1978. By May, 1986, Ainsworth had examined title on 443 leases in Forest and found 442 of them had been executed for a consideration of $7.50 gross rental. Ainsworth testified that he had read correspondence from Constance Slaughter-Harvey, assistant secretary of state, to Hill demanding that the school district "take some action and proceed with determining what leases needed to be renegotiated and to renegotiate those leases. And, I think, that the Forest Municipal Separate School District was under rather severe pressure at that time to take some action in the matter."
William A. Hood, a Vicksburg attorney and attorney for Petroleum Land Services, drafted a proposed resolution for the Forest Municipal Separate School District, which was adopted by the board of trustees July 14, 1986. The resolution recited that 443 leases were reviewed by Petroleum Land Services and 442 of them failed to meet the requirement of adequate consideration established by Holmes v. Jones, 318 So.2d 865 (Miss. 1975), and violated of Section 95. Further, that the board was required under the 1978 Act to insure that all leases were for adequate consideration in compliance with Section 95, and failure to do so would result in litigation between the board and the State, which would not be in the best interest of the school district.
The resolution further found that the board should accept the recommendation of Petroleum Land Services, and grant every leaseholder the "right to perfect the leasehold interest presently claimed by said record title." The method approved was for the record title holder to pay the school district an amount equal to seventy-five *21 percent of the fair market value of the land on the date of the lease, but crediting the rental paid on the lease.
Returning to the litigation, on May 5, 1986, an answer was filed on behalf of the board of trustees, and then separate answers were filed by the supervisors and board of education. The primary defense of the case was made by Forest Municipal Separate School District. The answers alleged the leases to Lackey were void because in violation of Art. 4, § 95, and an additional reason for the 1960 lease being void was that it was a "top lease." There was a subsequent amendment to the complaint and subsequent answers in which the defendants claimed two of the three appraisers were not freeholders. By counterclaim the defendants also asked for damages for waste caused by Thompson's removal of the wash rack and building.
Trial began January 19, 1987. W.J. Measells and Jack Miles, natives of Scott County, and members of the board of supervisors for 24 and 19 years, respectively, testified that economic conditions in Forest in 1955 were bad. Albert Hollingsworth, county superintendent of education, and James Johnson, former county superintendent, testified to depressed economic conditions in the county in the 40s and 50s. These witnesses also testified as to the absence of fraud or misrepresentation to the board of supervisors by lease applicants. Cecil O. Bailey, a contractor, testified that economic conditions in the state started to increase in the 60s.
Burt Atkinson, chairman of the board of trustees, testified that no appraisal had been made by the school district. Hill likewise testified that the board used the assessment at the time of the lease as the fair market value in determining what the leaseholders should pay to "perfect" their leases. He testified that this was the best the board knew to do, to negotiate at present day prices would create a chaotic situation in Forest. The city's assessed value of the lot in 1960 was $2,000.
Thompson was the concluding witness on his case-in-chief. A native, he had been practicing law in the county for forty years. He testified that even following World War II this state was still in a depression, with no money for goods or property. He served in the Legislature for two terms beginning in 1948. He was familiar with the history of the statutes dealing with sixteenth sections and was in the Legislature when the 1948 Act was passed. He had discussed the problems of sixteenth sections with J.P. Coleman, the late John W. Kyle (later a member of this Court), the late Joe T. Patterson, attorney general. It was the view of the state's leaders that development of sixteenth section property was in the best interest of Mississippi. Thompson attended public meetings on sixteenth sections in Jackson, Vicksburg and Meridian. The impetus for the 1948 Act was that the state's leaders felt the 1946 law was too rigid. In the 1950s a law office rented for ten to fifteen dollars a month. He testified that in 1955 Lot 6 in Block 7 had a negative worth, that $7.50 was a fair gross rental in 1955 and 1960, and that it was in the best interest of the school district to have someone take it and pay taxes on it. In these years businesses were moving from the downtown area, which continued to deteriorate in value. In 1955 the city ad valorem tax was $108.00 and the county $89.60. In 1960 the two were $120.00 and $35.10; in 1965, $80.00 and $21.88; in 1975, $141.00 and $24.14; and in 1985, $104.98 and $57.83. In 1985 the assessment of the land had dropped to $1,230.00 and the building to $714.00, totaling $1,944.
Thompson testified that the reason he filed a confirmation suit was that Hollingsworth, the county superintendent of education, had told him that he would be crazy to build on the lot, that the secretary of state was making a political campaign for governor out of sixteenth section lands.
Thompson was asked why he did not accept the offer of Hill to re-negotiate the lease. He replied that he would be happy to donate to the school, indeed would give the district $5,000, but he would not negotiate on any premise that the lease he held as successor in title to Lackey was void or defective. He considered the lease he held valid and binding. He testified that the movement to attack the sixteenth section leases in Forest was out of the "cabbage patch," and that if he agreed the present lease was defective or void, what was to keep somebody in the future coming out of the "cabbage patch" and claiming a current agreement with the district was also void?
As to the three appraisers, Thompson testified that V.R. Lackey was a local philanthropist and public spirited man who gave thousands of dollars to charity, and who died in 1959. He said that Otis Redden was a Mississippi State University *22 graduate, and an appraiser for the Farmers and Merchants Bank who moved from Forest before 1960. Thomas McCormick was a local businessman and a state senator.
The chancellor then took judicial notice of nineteen confirmation of title suits on sixteenth section lands in Forest beginning in the late 1940s, and the plaintiff rested.
The only person who testified for the defense was Ainsworth. The substance of his testimony has already been set forth. Ainsworth was not an appraiser. He was of the view that $7.50 was an inadequate consideration for this lot in 1955 and 1960.
The first rebuttal witness was Guyton Idom, retired chancery judge, who moved to Forest in 1947. He had been title attorney in securing title to the Natchez Trace Parkway in northeast Mississippi. He served eight years as a chancery judge. He testified that all the leases in Forest were $7.50 gross rental, that this was the policy. In the 1950s he testified lawyers got $25 for an uncontested divorce, $1.00 for preparation of a deed, $7.50 for a title certificate. According to Judge Idom, "everything" was moving out of town in the 1950s. He noted the lot was one-thirteenth or one-twelfth of an acre, and that $7.50 was a reasonable gross sum rental and in the best interest of the district. This was, in Judge Idom's opinion, the only way the district could hope to get anyone to build on the land and thereby secure an additional source of ad valorem revenue. He was also of the opinion that all ad valorem taxes on sixteenth section lands should go to the school district. Stability was important to him; in his view if the old lease could be set aside for lack of consideration, what would prevent someone later from attacking any present lease?
Mack Dawson Weems, a retired school teacher and county superintendent of education, in 1960 made $225 a month teaching. Major downtown businesses in this period either closed completely or moved to some other location. He was of the opinion that $7.50 was a fair gross sum rental for this lot.
James Reed, manager of the Laurel Federal Savings and Loan, said his association only loaned on residential property, but had a policy against lending on sixteenth section lands because of the undependability of title.
Arno Mills had lived in Forest since 1928. He had worked for the Mississippi Power & Light Company, had been fire chief of Forest, and Building Code Enforcement Officer of Forest. In 1955 Forest was in a depressed state and in 1960 just "floating." He was familiar with this lot since moving to Forest, and was of the opinion $7.50 was a fair gross sum rental. Had he been a member of the board of trustees when it was leased, he would have favored leasing it on these terms.
George Gordon opened a retail home and auto supply business in downtown Forest in 1960, was disappointed, and barely able to make ends meet for two or three years. He went out of business and was later employed by the city as building code inspector. He was of the opinion $7.50 was a fair gross sum rental. He noted that on south Main Street just south of the court square out of nineteen parcels for business locations, only eight had active businesses located on them.
L.A. Morris moved to Forest in 1955. In the insurance and real estate business, he made appraisals, bought and sold property of his own as well as for others, and was a director in a local bank. He testified that outside of lawyers there had been no profitable retail business in downtown Forest in thirty years. Most of the time the building on Lot 6 was vacant, and the most it had were "short term renters, very short term. The last renter in there, I believe, took bankruptcy." Everybody who could, left "this old hard core area, as it shows definitely now." As to the history of Lot 6, "Well it had always been a failure. If you want to put something there to fail, that's history on that corner." He thought $7.50 was fair rental, honorable men had approved it.
Harry Meredith Mitchell, a native of Forest born in 1921, and who was one of the local bankers, and appraised many land transactions for his bank, was familiar with the background and reasoning of the community leaders in wanting to make the leases long term and for a modest rental. He was of the opinion that the $7.50 gross rental was reasonable under the circumstances. He testified:
A. Well, to evaluate real estate there are a number of precepts in the appraisal process and I don't believe we need to go into them for this deliberation, because they don't fit. We are talking about a lease arrangement between a political subdivision duly appointed body, duly appointed or elected *23 body, acting for the benefit of a community as a whole and a willing purchaser of that lease, everybody guided by the general thinking of the community, at the time and under the present circumstances of that time.
* * * * * *
A. You can have more than one school of thought under those circumstances. The people with the responsibility of letting those leases can either try to get maximum return from the lease consideration and shortening of the term of the lease or they can believe, to the best of their knowledge, that a lease contract which would be attractive, which could become a thing of value to the person who entered into the lease would promote development and encourage improvement and thus broaden the general tax base of the community. There were people who wanted Forest to become a viable growing community. They could not see it taking place, unless they had an attractive lease to offer for sufficient time that the people could borrow money on it, so that they could afford to spend it making the improvements and developing it. I think the dollar consideration of the lease is accurate and material to the decision. I think that recognizing it was done with the thought of it being for the best good of the community and then not violating these leases later on [sic] the future is a paramount importance to this community. And I think that your consideration under those circumstances for the good of community in keeping with the general thinking of everybody in the community was exactly right.
Mitchell had moved from Forest in 1968 to take over another bank, but returned upon many occasions, and had noticed the continuing deterioration in downtown with dismay.
Virtually every witness who testified for Thompson who had lived in Forest since the 1940s was of the opinion that the board of supervisors had entered into the leases in good faith, and none knew of any fraud, misrepresentation or bad faith by any lease applicant. There was no evidence of any attempt to mislead the board of supervisors or trustees of the district.
Thompson's rebuttal testimony has been essentially related. He testified that he would never have considered purchasing and building on the lot had not his son returned to Forest to practice law with him. It had been the general opinion and conviction of all attorneys practicing law in Forest over the years that the leases were in all respects valid and binding.
He testified that he was astonished that there was a contest to his title confirmation suit, and various members of the boards had told him individually that they hoped he was successful. In all the confirmation suits he had filed over the years, none had ever been contested prior to this.

LAW
The chancellor in a twenty-page opinion found that the leases were executed in compliance with the statutes and § 211, and that a fair consideration had been paid in view of the economic conditions at the time.
Of course, if all the school district ever hoped to derive from this postage stamp sized lot was the $7.50 paid by Lackey, that would have been inadequate, although it clearly was not worth much.
But, the district hoped by this lease to get some business that would operate on it, give employment, create wealth, pay ad valorem taxes and help support the town. From this record there was only one person interested in leasing the property, H.L. Lackey, and when you total all the income he could have received in all the years he owned it, in all likelihood it never equalled the city and county taxes. Thompson testified, and it is undisputed, that in 1955 and 1960 this property had a negative worth.
The civic leaders may have made a mistake. This also may have been the best course to follow.[4] In any event decent and well-meaning public officials did the best they knew to do.
They should not be condemned and Thompson should not have to suffer. He should not have to lose the $20,000 he now has invested in this property. Nor should the school children of Forest have to suffer *24 the loss of tax revenue they most assuredly will with the majority's insensate holding. Thompson testified he planned to erect a $167,000 building on this lot if title were confirmed.
In the first place, other than this one man, William C. Thompson, I doubt if there is another person on the face of this earth who would ever consider spending any substantial sum of money on this particular spot of land.
And insofar as Thompson is concerned, it insults his intelligence to imply he might put any more money into this property with the stick of dynamite the majority puts under his title.
The Scott County supervisors, in looking to the 500-600 prospective leaseholders in the 1940s and the 1950s not only had the right, but the duty to take other factors than lease rental into consideration.
They had a stagnant town and county. Forest had gained 139 people between the 1940 and 1950 census, Scott County lost 1,463. There was no boom for Forest lots of any kind. Neither General Motors, General Electric nor Burlington Mills had expressed any interest in locating a manufacturing plant there. It should not be overlooked by this Court, either, that any client who questions a lawyer about building or putting permanent improvements on sixteenth section land anywhere, regardless of the deal the school district is offering, is not going to be reassured by his attorney. Recall Reed's testimony.
The civic leaders wanted to encourage people as best they could to live in Forest. They wanted as best they could to encourage businesses to locate there. And, those who were already there  the best prospects, of course, for leaseholders  they wanted to remain.
Section 211 of the Constitution authorized it, the General Acts of the Legislature authorized it, and the supervisors sought to make an attractive offer: a lease term long enough as to be next to owning this property outright, and a low one-time rental. In this the board was fully backed by leading businessmen, and the professions, legal and educational.
If the supervisors had acted precisely opposite and said, "No, our only responsibility as trustees is to get as much lease rental as we can and lease for as short a period as we can get by with," they may have got those leaseholders who because of previous investment in buildings had no other choice. They would have driven away those already there, however, who felt they had any alternative to staying. And most assuredly, they would have attracted no newcomers, business or residential. Not in the years between 1945-1955.
The majority, however, has looked only to the lease rental Lackey paid and rested its case.
And, what is the majority's authority for this conclusion?
Every case cited and quoted by the majority in which this Court set aside transactions dealing with sixteenth section lands because of inadequacy of consideration involved clearly distinguishable facts.
Koonce v. Board of Supervisors of Grenada County, 202 Miss. 473, 32 So.2d 264 (1947), and State ex rel. Kyle, Attorney General v. Dear, 209 Miss. 268, 46 So.2d 100 (1950), dealt with sale of timber for grossly inadequate prices. All the school could hope to receive from the transaction was the one payment for the timber.
Keys v. Carter, 318 So.2d 862 (Miss. 1975); Holmes v. Jones, supra; and Talley v. Board of Supervisors of Smith County, 323 So.2d 547 (Miss. 1975), dealt with agricultural leases of rural land in which, except for the minimum ad valorem tax on improved rural land, the school district would receive nothing.
Edwards v. Harper, 321 So.2d 301 (Miss. 1975), which came to us on a decree sustaining a demurrer, is also quite different. Harper held 25-year leases on two large tracts of realty incorporated into the municipality of Brandon, and got a 99-year extension from the board of supervisors because the land was then within corporate limits. In a suit to confirm title, some taxpayers sought to intervene, protesting that while Harper had paid $400 for the lease extension, the land had a fair market value of $22,500. We held the chancellor erred in sustaining the demurrer, and remanded for trial to determine whether or not this was a fair consideration.
The above cases constitute the case authority the majority cites for setting aside this lease for inadequacy of consideration. *25 All differ from this case, the likes of which have never been before this Court.[5]
How can you say a postage stamp lot in a deteriorating section of a depressed town, with no business operating on it, that if the board of supervisors leases it to a local businessman for a small consideration hoping he will put some business thereon, and knowing that if he does keep the lease he must pay an ad valorem tax on an assessment greater than anyone would pay for the land and building, that this is such a rank inadequacy of consideration as to be a donation?
Put another way, if it was a donation, it certainly was a little bitty one.
The majority likewise tells us that the leases at this price constituted a trust violation, and sprinkles its opinion with authorities on trusts, Bogart, Pomery, Scott and the Restatement. I certainly have no quarrel with these eminent authorities either, but I wish the majority would cite them on a statement in point with the facts of this case. 90 C.J.S., Trusts, § 298, p. 463, is quite in point:

Inadequacy of price. In the absence of circumstances showing fraud or irregularity, mere inadequacy of price is not sufficient ground for setting aside a sale by a trustee, especially after the sale is fully consummated by an honest purchaser. It has been declared that this is true however gross the inadequacy. On the other hand, it has been recognized that gross inadequacy of price may work a constructive fraud warranting the setting aside of the sale, at least as against a purchaser with knowledge of the trust. Before a court will set aside a private sale made in good faith by a conventional trustee in the exercise of a discretion incident to an express power of sale, both inadequacy of price and a justifiable expectation of securing a higher price must coexist. [Emphasis added; footnotes omitted]
The record in this case shows that Lackey during his lifetime repeatedly tried to induce Thompson to purchase his lease. Thompson was the most likely person; he was a lawyer and he had the adjacent lot. But Thompson simply was not interested in Lackey's lot.
Having badgered Thompson to purchase his lease without success, can it be doubted Lackey tried every other person he could think of who might be a prospect? Nobody bought.
The only reason one can surmise, or guess for that matter that Lackey continued to pay excessive ad valorem taxes each year on non-productive property was the "putting good money after bad" mentality, a hope that some day he might be able to sell his leasehold and at least "get something."
Except for the fortuitous circumstance of Thompson's son wanting to practice law with him in Forest, Thompson would never have had the slightest interest in this property. For this one purpose, however, the lot did have value to him. For this reason he was willing to pay a good price for the lot, and spend a great deal of money improving it.
In sum, considering the time, place and circumstances, there was competent evidence that Lackey paid a fair consideration. We certainly cannot say the chancellor was manifestly wrong.

IS THE MAJORITY VIOLATING THE CONSTITUTION?
As I have tediously attempted to make clear, the majority and I are poles apart. But, if the majority is correct in its conclusion it repeatedly tells us, even with exclamation points, that the consideration for Lackey's lease was "grossly inadequate," "shocks the conscience," and amounts to "a donation of public lands prohibited by the Constitution," then under the very decisions it cites and relies upon Mr. Thompson's lease is void.
Returning to the majority's authorities, State ex rel. Kyle, Attorney General v. Dear, supra, 209 Miss. at 279, 46 So.2d at 104, holds a lease for a grossly inadequate consideration violates § 95 and is void.
Then, the majority quotes Keys v. Carter, supra, 318 So.2d at 864, that such a lease "was and is void." (Majority Opinion, p. 9.)
And Holmes v. Jones, supra, 318 So.2d at 869, holds such a lease "void on its face."
And finally, quoting Talley v. Board of Supervisors of Smith County, supra, 323 So.2d at 550, the majority tells us such a "lease is void." (Majority Opinion, p. 9.)
*26 If the majority has correctly characterized the consideration paid by Lackey, then Thompson's lease is void. Void. A conveyance in contravention of the Constitution is of course against public policy and is void. Whelchel v. Stennett, 192 Miss. 241, 254, 5 So.2d 418, 419-420 (1943); McGowan v. State, 184 Miss. 96, 105, 185 So. 826, 829 (1939), "... the Constitution is the highest known law. No act prohibited by it can be given validity." It is a piece of trash paper. It cannot be resurrected. It cannot have life breathed into it by a county board, a state official, and certainly should not by this Court. Theobald v. Deslonde, 93 Miss. 208, 214, 46 So. 712, 713-714 (1908); Holman v. Ringo, 36 Miss. 390 (1859). See: Dayton v. Nell, 43 Minn. 246, 248, 45 N.W. 231, 232 (1890); Schneider v. Greater M. & S. Circuit, 259 N.Y.S. 319, 325, 144 Misc. 534, 538 (1932).
92 C.J.S., Void, pp. 1024-1025:
Generally speaking, a "void" act is incurable, and is wholly without force or effect as to all persons and for all purposes and incapable of being or being made otherwise. Primarily, the word "void" implies an act utterly of no effect, and, in its most unlimited sense, implies an act of no effect at all, and a nullity, ab initio. In one sense, and perhaps in the strictest and most accurate conception of its meaning, "void" involves the idea of utter ineffectiveness in all situations and for all purposes, leaving the effect of the void transaction the same as though it had not taken place, and a "void" act is one which is entirely null, not binding on any part, and not susceptible of ratification or confirmation; and its nullity cannot be waived... . [Footnotes omitted]
Indeed, the majority's, Keys v. Carter, supra, tells us that a void lease must be struck and the lessee treated as though the lease never existed, and a trespasser on the property:
However, the remedy is the voiding of the lease rather than its continuation for the remainder of the 25 year period with damages prospectively figured for each year of its future existence. In the event that the unequivocal allegations of the bill should be sustained by the chancellor upon trial of the case, an immediate cancellation of the lease would ensue and a judgment against defendants for such damages as might be proved and be found actually to have resulted from the inception of the lease to the date of its cancellation as an unconstitutional donation would be justified. See, Koonce v. Board of Supervisors of Grenada County, 202 Miss. 473, 32 So.2d 264 (1947).
318 So.2d at 864.
The majority even tells Mr. Thompson that regardless of how unfortunate it may be, this Court must follow the law. (Majority Opinion, p. 12.) He is informed, "The Court considers it appropriate to repeat a remark made in Transamerica Co. v. Paine Supply Co., 194 So.2d 490, 491 (Miss. 1967), that `we know of no way in which custom can change the law as written.'"
Having used these Mississippi decisions as a basis for declaring the leases were violative of § 95, the majority is clearly obligated to follow the legal conclusion reached by this Court in each of them that such leases are void.
How does the majority handle this legal conclusion reached by its own cited authorities? This inevitable conclusion? It does not follow them. It does not even attempt to distinguish them. Instead, it conveniently ignores this part.
Lo and behold, the majority tells us: "On the authority of Section 95 and the many cases applying it to sixteenth section lands, the Court holds that the 1955 and 1960 leases were voidable at the election of the state as trustee may be attacked." (Majority Opinion, p. 10.) Not void, but voidable.
There is vast gulf between void and voidable, as I will demonstrate below.
How can the majority change something that is "void" into "voidable"? Beats me. Does not even bother to explain. Just does it.
Decisions of this Court should be hallmarks of clarity, consistency and caution.
Petroleum Land Services gave this advice to the trustees, telling them the district did not have to cancel the lease, just go to the leaseholders and get the right price, and "reinstate" the leases for the remainder of their terms.
Some desperate leaseholders paid this ransom, as the record shows. Thompson, however, recognized the absurdity of this proposal. If someone could come out of the "cabbage patch" and tell him the lease he held was no good, what was to keep someone down the road from coming out of another "cabbage patch" and saying what *27 was now proposed was not just as invalid? Better to take his loss and forget it.
One at least can understand Petroleum Land Services being somewhat limited in legal knowledge.
And, what does the majority tell the district trustees they can do?
After putting a stick of dynamite under 400-600 sixteenth section lease titles in Forest, it tells all leaseholders, lienholders, title insurance companies, "This Court favors repose of title in real estate transactions." (Majority Opinion, p. 12.)
Of course there will have to be a little "adjustment period," and this case is remanded to the trustees "for action consistent with the 1978 Reform Act."[6] (Majority Opinion, p. 12.)
Miss. Code Ann. § 29-3-69 of that Act prohibits any lease term exceeding 40 years, and all leases must be for an annual rental at a fair market value. The leaseholders who have already done what the school district, upon Petroleum Land Services' advice, told them, paid seventy-five percent gross rental of the land assessment at the time of the original lease, and had their original leases "reinstated," will be quite pleased to learn that too was contrary to law and worthless.
A critical part of Forest is now at the mercy of any misguided or politically motivated secretary of state, and the local trustees and board of trustees have been given a glorious administrative headache. Can anyone conceive a sensible person being willing to invest any substantial sum in a new home or commercial building on this section?
Hooray. The majority has given this sixteenth section in Forest all the attraction of Sodom and Gomorrah.

THAT'S NOT ALL
I wish I were through, but there is a little more. I am even going to accept the majority's miracle in converting these dead, "void" leases to "voidable."
If the majority holds they are "voidable" then that is what they will have to be. "... the Court holds that the 1955 and 1960 leases were voidable at the election of the state as trustee..." (Majority Opinion, p. 10.) I accept that.
The legal consequences between a void and a voidable transaction are quite different, in fact there is a vast gulf between the two. The former is dead, the latter alive. Phelps v. Pecos Valley Southern R. Co., 182 S.W. 1156, 1157 (Tex.Civ.App. 1916).
When a transaction is "voidable" the party adversely affected has the choice of accepting it or repudiating it. As stated in 90 C.J.S., Void, pp. 1023-1024:
The word "voidable" is defined as meaning capable of being avoided or confirmed, not absolutely void but that the thing involved may be avoided ...
* * * * * *
... a "voidable" act takes effect as intended, and continues to be effectual to all intents and purposes until it is set aside or nullified as to all or some part of the persons or things which were affected by it. The word implies that there is a party who many avoid. A "voidable" act may be subsequently ratified or confirmed, or it may be made finally valid by failure within the proper time to have it annulled, or by subsequent ratification or confirmation.
In Turner v. Wakefield, 481 So.2d 846, 848-849 (Miss. 1985), the majority recently announced: "... a contract obtained by fraudulent representation is not void, but voidable. Upon discovery thereof, the one defrauded must act promptly and finally to repudiate the agreement; however, a continuance to ratify the contract constitutes a waiver."
As made clear by the majority's citations, suits to set aside sixteenth section leases for lack of consideration did not begin with Chapter 525, Laws of 1978. All of them preceded this Act by a number of years. Suits to cancel such leases were available to the state land commissioner, the attorney general and local districts long before this Act was a gleam in Mr. Ainsworth's eye. Suits to cancel such leases have never been dependent upon, and are not now dependent upon this Act. The Act neither adds to nor diminishes the responsibility of state and local officials to repudiate invalid sixteenth section leases.
The majority tells us these leases are voidable at the election of the state as trustees. I assume therefore they have always been "voidable." The terms of Mr. Lackey's leases have been known by every state land commissioner, beginning with Robert Earl Graham, through Watt Carter and John Ed Ainsworth. Every attorney *28 general, every district attorney and every member of every board of supervisors and school trustees since 1955 has had public notice of first the 1955, and thereafter the 1960 lease.
Did any of them act?
It is well settled that a trust can be bound by waiver and estoppel just the same as an individual can. 90 C.J.S. Trusts, § 298, p. 461; McClanahan v. Roanoke Iron Co., 95 Va. 552, 28 S.E. 955 (1898); 76 Am.Jur.2d Trusts, § 586.
On this one sixteenth section section there had been nineteen confirmations of title of lease in the chancery court.
No public official from 1955 until 1986 elected to avoid either of Lackey's leases. Can the State "elect" to do something at this stage? This Court is firmly committed to the doctrine of equitable estoppel against the State and political subdivisions as well. Monroe County Board of Education v. Rye, 521 So.2d 900, 908-909 (Miss. 1988); Covington County v. Page, 456 So.2d 739 (Miss. 1984); State v. Stockett, 249 So.2d 388 (Miss. 1971). For thirty-one years the State, county city and municipal separate school district assessed and received ad valorem taxes on this property and took no action. The school district and board of supervisors were aware that Thompson was spending a substantial sum of money in improving Lot 6, and took no action. If Thompson is not entitled at least the protection of the individuals in Monroe County Board of Education v. Rye, Covington County v. Page, and State v. Stockett, supra, then this Court is distorting the facts. See also: Miss. Code Ann. §§ 29-3-7 and 29-3-52. The only way this Court can legitimately deny Thompson relief is to declare Lackey's leases void.
If these leases were not void, and only voidable at the election of the State through the state land commissioner or some other state official, or the local authorities, because no public entity took any action for thirty-one years to set aside transactions made honestly and in good faith, this Court is obligated to either apply the doctrine of equitable estoppel and affirm the chancery court, or overrule Monroe County Board of Education v. Rye, Covington County v. Page, and State v. Stockett.

CONCLUSION
The people of this State recognized the value of having a town on sixteenth section land when they adopted the amendment to Art. 8, § 211 in 1944, and authorized a 99-year lease for a gross sum rental. The Legislature likewise recognized it when they passed 1946 Miss. Laws Chap. 443, 1948 Miss. Laws Chap. 497, 1956 Miss. Laws Chap. 290. Also, Dodds v. Sixteenth Section Development Corp., 232 Miss. 524, 99 So.2d 897 (1958).
In sum, in the 1940s the Legislature, our people, and especially our people who lived in municipalities situated on sixteenth section lands, wanted to put the question of title at rest. They wanted to encourage development and improvement of the city land. Thereby the City of Forest and other similarly situated could better hope for growth of their town. It is that simple.
There is no question in this case but that the letter of § 211 of the Constitution was scrupulously adhered to, as were all the technical requirements of the statutes passed thereunder.
The factual situation in this case is unique. We have had no sixteenth section land cases like this before.
By perfectly sound trust law, II A.W. Fratcher, Scott on Trusts, § 181, 4th Ed. (1987), this Court could render immeasurable benefit to Forest and its municipal separate school district in unanimously affirming the chancery court decree.
The purpose of a school trust is to bring in revenue for the school. A dollar to a school is a dollar, no matter its source, and whether it comes directly or indirectly. It should be readily apparent that, aside from a gold or silver mine, or a producing oil or gas well, the very best prospect for revenue for a school district is to have a town sitting on top of it.
Who will be willing, however, to build a permanent residence or commercial building when the title is uncertain and of short duration? No one, if he has any choice.
Seen in this light, the civic leaders made a prudent decision in 1947, and trustees in the true and accurate sense of the word.
The amicus curae brief filed by Mississippi Valley Title Insurance Company warned this Court of the serious consequences which would follow a reversal of the chancery court, wisdom the majority is ill-advised to ignore.
The leaseholders stuck with a sizable investment already made on their leaseholds will have to do the best they can. They will be looking for the first, least expensive *29 exit. No new investments in residences (other than tents, shacks or mobile homes) can be expected. No commercial structures, in which Forest can take pride, are likely to be made. Mr. Thompson's building, which would easily produce $1,500-$2,500 annually in city and county tax revenue, is now a discarded dream.
The people of Forest and Scott County made the decision in setting gross rentals at $7.50 for a 99-year lease on a town lot. As to Lackey's leases, there has been no showing that there was ever any "justifiable expectation" of getting more than the district received, which should bind the district. Kramme v. Mewshaw, 147 Md. 535, 128 A. 468 (1925).
Having spent my adult life in a small town very much like Forest, I can understand the awful conditions that prevailed in small towns in Mississippi in the late 1940s and 1950s, and wondering where our next meal was coming from. Had my home town been on sixteenth section land, and we been faced with the same choice as that facing Forest, I am confident I would have advocated essentially the same course chosen by Forest and Scott County.[7]
The beneficiaries of this sixteenth section are not this Court or any other official in Jackson. The sole beneficiaries are the people who live in the Forest school district, the children who go to school there, and their parents and taxpayers who must pay for their education. They are the ones involved. We should bear in mind that there has been no protest from any of these beneficiaries. The contest of Thompson's confirmation suit arose entirely from outside the district.
The 1978 Act may prove beneficial. It was designed, however, to deal with school leases as they expire. There is nothing about the Act to suggest it is a mandate for a state or county official to disturb leases executed prior to 1978. The Act neither adds nor diminishes the duty every such official already had (with the exception of the secretary of state, who by virtue of the abolition of the office of state land commissioner assumed the duties of that office).
Because there are men and women and business enterprises who do own homes, commercial buildings and fixed improvements on this section, I do not doubt the majority's holding will bring in revenue. These unfortunate people have no choice. I am just as convinced it will be a Pyrrhic windfall. Investment in this area will be catastrophically reduced.
Investment is based upon confidence, sometimes overconfidence, but never upon fear.
This Court might exercise a little humility and acknowledge that the leasing policy of sixteenth section town lots, when done honestly and in good faith, is a matter best left entirely in the hands of the people who live there, who after all, will either be enriched together or suffer together.
As this Court should know, small towns in Mississippi continue in a desperate struggle to keep afloat.
We should affirm the chancery court, and insofar as this Court goes, quietly shut the door and leave the people of Forest to make their own future.
SULLIVAN, J., joins this opinion.

ON PETITION FOR REHEARING
ANDERSON, Justice, dissenting:
When I read Keys v. Carter, 318 So.2d 862 (Miss. 1975), I see clearly that this Court can find that lease agreements for sixteenth section land can be deemed an unconstitutional donation. But, where this Court has found that to be the case, we declared that the "lease was and is void." Id. at 864. Since the majority now declares that the leases are voidable, surely the doctrine of equitable estoppel must have a role.
This is in line with our decisions in Monroe County Board of Education v. Rye, 521 So.2d 900 (Miss. 1988). In that case we held, "[t]he state, its counties, subdivisions and municipalities may be equitably estopped under the proper circumstances." Id. at 908-09. Even, Oktibbeha County Board of Education v. Sturgis, 531 So.2d 585 (Miss. 1988), the case that the majority insists is controlling, recognizes the doctrine of equitable estoppel. Id. at 589. That case also recognized the corollary of the equitable estoppel rule, in that, this Court emphasized that "equitable estoppel *30 cannot be applied against the state or its counties where the acts of their Offices were unauthorized." Id. (emphasis added). In Sturgis, for example, the officials entered into a 99-year lease although the legislature had prohibited executing a lease for more than 25 years.
In support of this corollary found in Sturgis, we relied, in part, on several cases which emphasized the authority that bodies were cloaked, and they failed to address the question of equitable estoppel. See, e.g. American Oil Co. v. Marion County, 187 Miss. 148, 192 So. 296 (1939) (Board of Supervisors acted outside their authority when they executed lease for land belonging to county for courthouse purposes);[1]Gift v. Love, 164 Miss. 442, 144 So. 562, 565 (1932), (superintendent of banks, a public officer, had no authority to approve compromise settlement); Eastman Oil Mills v. State, 130 Miss. 63, 93 So. 484, 486 (1922) (officers of the state cannot grant indulgences authorizing the committal of offenses, and they have no power to authorize the continuance of any act or business which is in violation of law.) We also relied on 31 C.J.S. Estoppel § 142-43. Section 144 of that volume provides the following:
[T]he rule is that a municipality or other governmental agency may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized... . It has also been applied with respect to contracts not void but merely voidable... .
Id. at 722-23; See also, State, ex rel., Shell Oil Co. v. Registrar of State Land Office, 193 La. 519, 192 So. 519 (1939) (State estopped to contest lease for failure to comply with advertising requirements after having received rental payments for several years.).
In the case sub judice, it is unquestioned that the board had the authority to enter a lease. What is at issue is the manner of exercise of that power. Hindsight enables the majority to believe that the amount in the lease was inadequate and grossly inadequate. See, op. at 9, 10, 11, 15. As we look over our shoulders today, its easy for us to say that a payment for land that totalled less than a dollar per year may be unreasonable, inadequate, or grossly inadequate. But, we must be cognizant of the historical framework and economic conditions of communities before we condemn acts of governmental bodies that are supposed to have the public's best interest at heart. Twenty-five or ninety-nine years from now, this Court may be required again to review sixteenth section land leases. Will the amounts that are presently being negotiated or entered into be so grossly inadequate that they should be voided? Or should they be voidable to allow equitable estoppel to help insulate the agreements from the hindsight of this Court? Because questions will always remain regarding whether adequate consideration has been given, it is less likely that lenders or title insurance companies will continue, without great trepidation, to loan development dollars or insure any leases under the majority's interpretation.
Bona fide purchasers of sixteenth section lands should not have to engage in speculating whether an agreed upon price for a term of years will run afoul of Section 95 of the Constitution as determined by this Court many years down the road. These purchasers should be allowed to indulge in a presumption of regularity in this regard, and this Court should consider the lease in question at best voidable and subject to equitable estoppel. I would hold that the doctrine of equitable estoppel applies.
HAWKINS, P.J., and SULLIVAN, J., join in this dissent.
NOTES
[1] Richard C. Hill is Superintendent of Forest Municipal Separate School District, who with Burt Atkinson, President, and Eddie Lee Johnson, Harold Windham, Mrs. George Taylor, Jr. and Fred Bagley, constitute the members of the Board of Education of Forest Municipal Separate School District. W.J. Measels, Jr. is President of the Board of Supervisors of Scott County, and with Monzell Stowers, Powell Jones, Jack I. Miles and Isaac Weems, Jr. constitute the members of Board of Supervisors of Scott County, Mississippi. Albert Hollingsworth is Scott County Superintendent of Education and L.E. Gomillion is President of Scott County Board of Education together with Tommy Gilbert, W.R. Booth, A.G. Eason, Jr., and Roy Miles, members.
[2] This opinion does not include the discussion of the 1830 Treaty of Dancing Rabbit Creek with the Choctaw Nation or the 1832 Treaty of Pontotoc Creek with the Chickasaw Nation. Such a history is included in Papasan, supra, as that case specifically addresses alleged inequities in economic benefits of public school lands in the twenty-three (23) northern Mississippi counties within Chickasaw Cession. The County of Scott is included within the lands ceded under the Choctaw Cession, and is not involved in the funding inequity question.
[1] See, Chevron U.S.A., Inc., et al. v. State of Mississippi, et al., Cause No. 07-CA-58036, ___ So.2d ___ (decided April 4, 1990, and not yet reported), in which continuation of lease does violate § 211.
[2] In an agricultural lease there would be a modest ad valorem assessment on unimproved land.
[3] Before this instrument was recorded, in less than two years Warren Clark (who had acquired a one-fourth interest in this property) sold his interest to R.E. Harper for $2,250.00.
[4] It did far more to protect and preserve the town, and create revenue for the school, than what the majority is now doing, in my view.

Yet even if they made a mistake, I never heard of a trust seeking to set aside a trust authorized contract, executed by both sides in good faith, simply because the trustee made a bad bargain, even a very bad one.
[5] I have no quarrel with the remaining baggage of authorities loading the majority opinion, which adds nothing to its ratio decidendi. I could just as well cite them in this dissent.
[6] "Reform" is the majority's christening.
[7] My office rent from 1947-1950 was $9.00 a month; utilities, such as they were, were furnished. A kind landlord permitted me to remain although many months delinquent. I was all he had.
[1] It should be noted that in deciding this case, this Court stated, "[i]t matters not whether its [board of supervisors] action ... be regarded as judicial, legislative, or ministerial. Excess of authority in either capacity is simply void... . They can do valid acts, only as empowered by law." quoting Howe v. State, 53 Miss. 57 (1876).